**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| The Navajo Nation, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | No. CV 05-1824-PCT-PGR |
| | ) | CV 05-1914-PCT-EHC |
| | ) | CV 05-1949-PCT-NVW |
| | ) | CV 05-1966-PCT-JAT |
| | ) | (consolidated) |
| vs. | ) | |
| | ) | **ORDER** |
| U.S. Forest Service, et al. | ) | |
| | ) | |
| Defendants. | ) | |

This consolidated matter comes before the Court on the parties' cross-motions for summary judgment and following a bench trial on Plaintiffs' claims brought under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4 ("RFRA").[1]  The Court now makes its ruling.

---

[1] The Complaint for the Navajo Nation and the Sierra Club was initially filed on June 17, 2005.  However, on June 23, 2005, before the Complaint was served, the Navajo Nation and Sierra Club filed a First Amended Complaint that added as Plaintiffs the White Mountain Apache Tribe, the Yavapai-Apache Tribe, the Center for Biological Diversity and the Flagstaff Activist Network. These parties will be referred to as the Navajo Plaintiffs throughout this opinion.  Shortly after the Navajo Plaintiffs amended their Complaint, three separate Complaints were filed by: (1) Hualapai Tribe, Norris Nez, and Bill Bucky Preston ("Hualapai Plaintiffs"); (2) Rex Tilousi, Dianna Uqualla, and the Havasupai Tribe ("Havasupai Plaintiffs"); and (3) the Hopi Tribe.  On unopposed motion, these matters were transferred and consolidated with the instant action on July 13, 2005.

## I.   Factual Background

This case involves a challenge to the Forest Service's decision to authorize upgrades to facilities at the Arizona Snowbowl ("Snowbowl"), an existing ski area in the Coconino National Forest ("CNF").[2] The Plaintiffs in this consolidated case include the Navajo Nation, the Hopi Tribe, the Havasupai Tribe, the Hualapai Tribe, the Yavapai Apache Nation, the White Mountain Apache Nation, Bill Bucky Preston (a member of the Hopi Tribe), Norris Nez (a member of the Navajo Nation), Rex Tilousi (a member of the Havasupai Tribe), Dianna Uqualla (a member of the Havasupai Tribe), the Sierra Club, the Center for Biological Diversity, and the Flagstaff Activist Network.  The Defendants are the United States Forest Service ("Forest Service"), Nora Rasure, the Forest Supervisor, and Harv Forsgren, who was the appeal deciding officer and Regional Forester.  Both Ms. Rasure and Mr. Forsgren were named as Defendants in their individual capacity.  In addition, the Arizona Snowbowl Resort Limited Partnership ("ASR"), the current owner and operator of the facilities located at the Snowbowl ski area, moved to intervene in these proceedings on June 27, 2005.  After receiving briefing on ASR's motion and hearing oral argument, the Court granted ASR's Motion to Intervene (Doc. 45) on July 18, 2005.

The Snowbowl lies on the western flank of the San Francisco Peaks ("Peaks"), and is operated under a 777-acre Forest Service-issued SUP, which is renewable on a 40-year basis.  The CNF Land and Resource Management Plan ("Forest Service Plan"), which was subject to its own process under the National Environmental Policy Act ("NEPA") and adopted in 1987, designates the entirety of the Snowbowl SUP as a "Developed Recreation Site."  Under the Forest Service Plan, the Snowbowl is located within management area ("MA") 15, which has a management emphasis of developed recreation, including the

---

[2]The current proposal does not seek to expand the existing Snowbowl Special Use Permit ("SUP") of 777-acres, but instead, seeks to upgrade the Snowbowl's existing facilities and infrastructure.  Many of the activities approved by the current Snowbowl decision were previously authorized by the 1979 Environmental Impact Statement ("EIS"), and all of the approved activities are within the preexisting permit boundary.

1  Snowbowl recreation facilities.  Furthermore, the Snowbowl is surrounded on three sides by

2  the 18,963-acre Kachina Peaks Wilderness, which is designated as MA 1 and managed for

3  wilderness values.

4      The Snowbowl has been used as a ski area since 1938.  In 1979, the Forest Service

5  conducted an extensive process pursuant to NEPA to evaluate proposed upgrades to the

6  Snowbowl, which included the installation of new lifts, trails and facilities.  Specifically, the

7  1979 Snowbowl decision approved 206 acres of skiable terrain and facilities to support a

8  comfortable carrying capacity ("CCC") – the number of guests that the Snowbowl facilities

9  could comfortably carry at one time – of 2,825 skiers.  The Forest Service's decision to

10  approve the proposed action was challenged in court by several Indian tribes.  The tribes

11  asserted that development of the Peaks would be a profane act, and an affront to the deities,

12  and that, in consequence, the Peaks would lose their healing power and otherwise cease to

13  benefit the tribes.  Wilson v. Block, 708 F.2d 735, 738 (D.C. Cir. 1983), cert. denied, 464

14  U.S. 956 (1983).  In addition, the tribes argued that development would seriously impair their

15  ability to pray and conduct ceremonies upon the Peaks.  Id.  However, the District of

16  Columbia Court of Appeals eventually upheld the Forest Service's decision to move forward

17  with the upgrades.  Id. at 760.

18      Since 1979, the Snowbowl has operated under the direction of the EIS upheld in

19  Wilson.  Many of the improvements authorized by the Forest Service in 1979, and later

20  upheld by the Wilson decision, have been implemented over the years.  However, in

21  September of 2002, ASR sought to implement the remaining previously authorized upgrades

22  (including cutting certain ski runs), and submitted a formal proposal to implement

23  snowmaking at the facility using A+ reclaimed water.  After an extensive environmental

24  review under NEPA that spanned several years of public participation, tribal consultation and

25  input, and analysis, the Forest Service ultimately approved ASR's proposal.  Specifically, in

26  February of 2005, Forest Supervisor Nora Rasure issued a Final Environmental Impact

27  Statement ("FEIS") and a Record of Decision ("ROD").  The Forest Service's ROD approved,

28

in part: (a) approximately 205 acres of snowmaking coverage throughout the area, utilizing reclaimed water; (b) a 10 million-gallon reclaimed water reservoir near the top terminal of the existing chairlift and catchments pond below Hart Prairie Lodge; (c) construction of a reclaimed water pipeline between Flagstaff and the Snowbowl with booster stations and pump houses; (d) construction of a 3,000 to 4,000 square foot snowmaking control building; (e) construction of a new 10,000 square foot guest services facility; (f) an increase in skiable acreage from 139 to 205 acres – an approximate 47% increase;[3] and (g) approximately 47 acres of thinning and 87 acres of grading/stumping and smoothing.  The Plaintiffs appealed the Forest Supervisor's decision, and the Forest Service's Southwestern Regional Office arranged a technical review team to evaluate the administrative appeals.  On June 8, 2005, the Forest Service issued its final administrative decision and affirmed the Forest Supervisor's original conclusions.  This litigation followed.[4]

On August 12, 2005, the parties filed cross-motions for summary judgment on, in part, claims brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").  The APA claims are based on the Forest Service's alleged failure to comply with requirements of NEPA, 42 U.S.C. §§ 4321-4307d ("NEPA"), the National Historic Preservation Act, 16 U.S.C. §§ 470 et seq. ("NHPA"), RFRA, 42 U.S.C. §§ 2000bb-2000bb-4 ("RFRA"), the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"), the Grand

---

[3]It is important to note that although only 139 acres of skiable terrain currently exist at the Snowbowl, the Wilson decision specifically approved 206 acres of skiable terrain.  Accordingly, the current proposal, to the extent it seeks to increase skiable acreage, is fully consistent with the D.C. Circuit's previous ruling in 1983 upholding the Forest Service's 1979 decision.

[4] Shortly after filing their complaints, the Plaintiffs filed a Motion for Temporary Restraining Order Or, In the Alternative, Preliminary Injunction (Doc. 5).  A few days later, the Plaintiffs filed a Stipulated Motion to Withdraw Plaintiffs' Motion for Temporary Restraining Order (Doc. 12), and requested that the Court set a briefing schedule for Plaintiffs' preliminary injunction motion.  The stipulated motion was granted by the Court.  On July 13, 2005, the Court heard oral argument on the Plaintiffs' Motion for Preliminary Injunction.  However, the request for relief was denied as moot after the parties agreed that ASR would not move forward with the project until after the Court ruled on the anticipated summary judgment motions and, if necessary, held a bench trial on the RFRA claims.

Canyon National Park Enlargement Act, 16 U.S.C. § 228i ("GCEA"), and the National Forest Management Act, 16 U.S.C. §§ 1600-1687 ("NFMA").  In addition, an alleged failure of the Forest Service to comply with its trust responsibility to the tribes was included in these motions.

## II.   Legal Standard and Analysis

In reviewing administrative agency decisions, the function of the district court is to determine, as a matter of law, whether evidence in the administrative record permitted the agency to render the decision it did.  Accordingly, summary judgment is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did.

A person suffering legal wrong because of an agency action, or adversely affected or aggrieved by an agency action within the meaning of the relevant statute, is entitled to judicial review thereof. 5 U.S.C. § 702. Agency action made reviewable by statute, and final agency action for which there is no other adequate remedy in a court,  are subject to judicial review. 5 U.S.C. § 704. Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706; Center for Biological Diversity v. United States Forest Service, 349 F.3d 1157, 1165 (9th Cir. 2003). To determine whether agency action was arbitrary or capricious, a court must consider "whether the decision was based upon a consideration of the relevant factors and whether there has been a clear error of judgment."  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 368 (1989).

### A.   National Environmental Policy Act

The purpose of NEPA, 42 U.S.C. §§ 4321 et seq., is to focus the attention of federal agencies and the public on a proposed action so that the environmental impacts of the action can be studied before a decision is made.  By focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will

not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, (1989).  Accordingly, NEPA requires federal agencies to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2).  However, NEPA does not mandate certain substantive results, but instead prescribes the necessary process an agency must undergo to evaluate a proposed action's potential environmental impact.  Methow Valley, 490 U.S. at 350.

In reviewing the required EIS, the court must determine whether the document contained a "reasonably thorough discussion of the significant aspects of the probable environmental consequences."  Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992).  Within the Ninth Circuit Court of Appeals, courts are directed to employ a "rule of reason" standard to make this finding.  Center for Biological Diversity, 349 F.3d at 1166.  Under the rule of reason standard, which is essentially applied in the same manner as the arbitrary and capricious standard, review consists only of ensuring that the agency has taken a hard look at the environmental effects of the proposed action.[5]  Id.  Once the court is satisfied that a proposing agency has taken the requisite hard look at a decision's environmental consequences, the review is at an end.  Friends of the Southeast's Future v. Morrison, 153 F.3d 1059, 1063 (9th Cir. 1998).

It is the Plaintiffs' position that the Forest Service failed to take the required hard look at the environmental consequences of its actions, and that as a result, the Forest Service's actions were arbitrary, capricious and not otherwise in accordance with law.  However, the Defendants and Intervenor respond that the Forest Service fully discharged its NEPA responsibilities by preparing an EIS with public involvement.  Each NEPA violation alleged by the Plaintiffs is discussed individually below.

_____

[5] The Court notes that the adjective "hard," and the phrase "hard look," are subject to at least twenty-five different definitions or meanings.  Nevertheless, the parties have used the phrase "hard look" to define the nature of the inquiry required of the Forest Service; therefore, it is reluctantly adopted by the Court.

### 1.    Statement of Purpose and Need

The Plaintiffs in this case allege that the stated purpose and need for the proposed action is impermissibly narrow, improperly focused solely on improving the Snowbowl's financial viability, and based on faulty data.  The Defendants and Intervenor assert that the stated purpose and need is reasonable and provided the basis for the Forest Service's consideration of a reasonable range of alternatives.  The Forest Service identified the overall purpose and need for the project as follows:  (1) to ensure a consistent and reliable operating season, thereby maintaining the economic viability of the Snowbowl and stabilizing employment levels and winter tourism within the local community; and (2) to improve safety, skiing conditions, and recreational opportunities, bringing terrain and infrastructure into balance with current use levels.

The regulations implementing NEPA explain that an EIS "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F.R. § 1502.13.  Furthermore, the Ninth Circuit has determined that agencies should be afforded considerable discretion in defining the purpose and need of a project.  Morrison, 153 F.3d at 1066.  However, this discretion is not without limitations.  Id.  For example, "an agency cannot define its objectives in unreasonably narrow terms."  City of Carmel by the Sea v. United States Dep't. of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997); see also City of New York v. United States Dep't of Transp., 715 F.2d 732, 743 (2d Cir. 1983) ("[A]n agency will not be permitted to narrow the objective of its action artificially and thereby circumvent the requirement that relevant alternatives be considered.").

The Court concludes that the Forest Service's statement of purpose and need for the proposed project is not unreasonable.  See City of Carmel by the Sea, 123 F.3d at 1155 (Forest Service's statement of purposes is to be evaluated under a reasonableness standard).  The Forest Service Plan, which the Forest Service points out was subject to its own NEPA process, designates the entirety of the Snowbowl SUP as a "Developed Recreation Site." Under the Forest Service Plan, the Snowbowl is located within MA 15, which has a

management emphasis of developed recreation, including the Snowbowl recreation facilities. Furthermore, the Final EIS explains that the proposed action "responds to the goals and objectives outlined in the Forest Service Plan, and helps move the project area towards desired conditions described in it."  For example, the FEIS states that one purpose of the proposed action is to "ensure a consistent and reliable operating season" at the Snowbowl. According to the Forest Service, because skier visits at the Snowbowl are directly correlated to the amount of snow on the ground, the significant variability in snowfall has resulted in an inconsistent operating season.  In addition, the goal of providing a reliable ski season is consistent with the Forest Service's multiple-use mandate and direction to provide recreational opportunities for the public.

The Court notes that the FEIS also identifies the need "to improve safety, skiing conditions, and recreational opportunities by bringing existing terrain and infrastructure into balance with existing demand."  For example, the Forest Service identified a need to "[i]mprove the quantity and distribution of beginner and intermediate (including low intermediate and advanced intermediate) terrain and skier safety by developing additional terrain within the existing SUP area."  The FEIS adequately documents that the Snowbowl has a deficit of intermediate and beginner terrain when compared to ski industry norms.  In sum, the Court concludes that the Forest Service developed a reasonable statement of purposes and needs under the standard developed by the Ninth Circuit.

## 2.    Reasonable Range of Alternatives

Next, the Plaintiffs contend that the Forest Service violated NEPA by failing to consider a reasonable range of alternatives.  For example, the Navajo Plaintiffs contend that the Forest Service should have considered a proposal to close the ski area, a buy-out by the tribes, or an alternative with reduced snowmaking coverage.  In addition, the Havasupai Plaintiffs maintain that the Forest Service should have considered water trading. In response, the Forest Service states that it did, in fact, consider many of the alternatives raised by the Plaintiffs, but reasonably eliminated them from more detailed evaluation because they did

not meet the purposes and needs for the proposed action.  Moreover, the agency points out that many of the alternatives proposed by the Plaintiffs do not represent feasible propositions.

The Code of Federal Regulations requires that only reasonable alternatives be considered.  40 C.F.R. § 1502.14.

> In this section agencies shall:
>
> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.  (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.  (c) Include reasonable alternatives not within the jurisdiction of the lead agency.  (d) Include the alternative of no action.  (e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14.

"An agency's discussion of alternatives must be bound by some notion of feasibility." Muckleshoot v. United States Forest Service, 177 F.3d 800, 814 (9th Cir. 1999).  In addition, an agency need not consider every available alternative.  Headwaters, Inc. v. Bureau of Land Management, 914 F.2d 1174, 1180 (9th Cir. 1994).  The range of alternatives is reviewed under a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice.  Id.  NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.  Id. at 1181.  However, NEPA does require federal agencies to rigorously explore and objectively evaluate all reasonable alternatives.  With respect to alternatives that were eliminated from detailed study, NEPA simply requires a brief discussion of the reasons for their elimination.  40 C.F.R. § 1502.14(a).  As the parties correctly identify, "[t]he existence of reasonable but unexamined alternatives renders an EIS inadequate."  Morrison, 153 F.3d at 1065; see also Muckleshoot, 177 F.3d at 814.

A review of the EIS shows that the Forest Service gave detailed consideration to three alternatives: (1) the no action alternative; (2) the proposed action; and (3) the no snowmaking

or snowplay alternative, which responds to public concerns over the use of reclaimed water on the Peaks.  Furthermore, the Forest Service also gave consideration to an alternative to remove the ski area; several alternatives that would have included night lighting; an alternative with a lower amount of new skiable terrain; an alternative with reduced snowmaking coverage; alternatives that would have included summer recreational activities such as mountain biking; alternatives that would have used on-site or nearby water sources instead of reclaimed water; and an alternative that would have used other pipeline alignments.  In addition, the Court concludes that the Forest Service properly eliminated closure of the Snowbowl from detailed analysis because it did not meet the stated purposes and needs for the proposed action.  Since the Coconino Forest Service Plan instructs that the 777 acres of the Snowbowl be managed to emphasize developed recreations, an alternative that would dismantle the ski area was certainly outside the scope of the proposed action and need not have been considered in detail.  As the Ninth Circuit has previously stated, "[w]hen the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th Cir. 1986).

The statement of purposes and needs for the Snowbowl proposal permitted the Forest Service to evaluate a reasonable range of alternatives.  The Plaintiffs bear the burden of demonstrating to the Court that they brought a reasonable alternative to the Forest Service's attention during the public NEPA process, and that such an alternative was not adequately considered. City of Angoon, 803 F.2d at 1021-22.  The Plaintiffs have failed to meet this burden.[6]  Accordingly, the Court concludes that the Forest Service did not act unreasonably

---

[6]Many of the reasonable alternatives Plaintiffs now advance in their respective motions for summary judgment were never raised in the NEPA comment process or in the administrative appeals.  Accordingly, this failure now bars them from judicial review due to the requirement of exhaustion.  For example, although they now claim otherwise, not one tribal plaintiff comment letter or appeal letter mentions the buy-out alternative now advanced by the Navajo Plaintiffs.  However, the Court notes that even if the alternative was properly raised before the Forest Service, it is not significantly distinguishable from an alternative to close the ski area, which was considered. See

in rejecting the various alternatives raised by the Plaintiffs during the project's public scoping process.

### 3.  Cumulative and Indirect Impacts

#### a.  Impacts of Diverting 1.5 Million Gallons of Reclaimed Water a Day

The Plaintiffs contend that the Forest Service failed to take the requisite hard look at the environmental impacts of the Snowbowl expansion project by neglecting to consider the cumulative impacts and/or indirect effects of diverting 1.5 million gallons of reclaimed water a day from Flagstaff's aquifer to the Snowbowl for snowmaking.[7]  The Plaintiffs assert that "the proposed snowmaking will result in a decrease to the aquifer" and point to a technical report prepared by Peter Schwartzman and Abe Springer, along with other public comments as the basis for their argument.  However, the Court concludes that the Forest Service did not refuse or fail to consider this impact.

A review of the FEIS reveals that the Forest Service identified the proposed action's potential impacts on aquifer recharge as an area requiring additional analysis and disclosure. The Snowbowl FEIS Section on Watershed Resources – Chapter 3H – specifically analyzed the potential long-term effects on the regional aquifer from diversions of reclaimed water for snowmaking.  For example, the agency contracted hydrologists to study "precipitation; water

Headwaters, 914 F.2d at 1180-81.

[7]The Plaintiffs also maintain that the Forest Service failed to address the cumulative and indirect impacts on noise, on aesthetics, on traffic and ski area access, and on wildlife and habitat. However, a review of the FEIS reveals that the Forest Service specifically evaluated and disclosed the anticipated effects of each of these categories.  For example, regarding noise impacts, the Forest Service determined that from a distance of 1.5 miles and closer, the snowmaking system would be audible and above ambient noise levels.  With respect to impacts on aesthetics, the Forest Service used the Visual Management System – a landscape management tool – to evaluate the proposed action's impacts to certain visual quality objectives and disclosed the cumulative visual effects in the FEIS.  In addition, the FEIS documents careful consideration of impacts to traffic and ski area access in Section 3C.  Lastly, Section 3K of the FEIS contains a detailed analysis of the Snowbowl proposal's potential impacts on wildlife.

loss to evaporation, transpiration, and sublimation; and the resulting water available for groundwater recharge or surface water run off."  This data was then used to analyze how much water would be available for recharge to the regional aquifer.  The Forest Service found that the proposed snowmaking would result in a reduction in groundwater recharge to the regional aquifer of slightly less than two percent of the City of Flagstaff's total annual water production.  The cumulative watershed impact as a result of the diversion was determined to be negligible to moderate.[8]  The Court also notes that in reaching this estimate, the Forest Service considered, among other sources, the Schwartzmann and Springer report raised by the Plaintiffs.  In sum, the record demonstrates and the Court is satisfied that the Forest Service responded to concerns about the impacts to recharge of the aquifer by conducting reasonable analysis.

### b.    Impacts of Snowmaking Using Reclaimed Water

Next, the Plaintiffs contend that the Forest Service failed to conduct a reasonable scientific analysis of the environmental impacts of the proposed snowmaking.  However, the Defendants and Intervenor maintain that the Forest Service took a hard look at the impacts of snowmaking using reclaimed water.  The Court concludes that the record shows that the Forest Service conducted a reasonable scientific analysis of the environmental impacts of the proposed snowmaking based on the best available scientific evidence.

First and foremost, it is important for the Court to note that the Arizona Department of Environmental Quality ("ADEQ") has adopted water quality standards for the direct reuse of reclaimed water aimed at protecting health and the environment.  Furthermore, the ADEQ specifically allows Class A+ reclaimed water–the class of water to be used at the Snowbowl–for direct reuse in snowmaking.  As such, the Forest Service properly relied, in part, upon the ADEQ's determination that snowmaking is an acceptable and safe use of

---

[8] Even with the amount of reclaimed water diverted to the Snowbowl, the Rio de Flag Water Reclamation Facility ("WRF") would still have over 500,000 gallons per day available for release to the Rio de Flag.

reclaimed water.  In addition, the Forest Service evaluated extensive data monitoring Class A+ reclaimed water from the Rio de Flag WRF for wastewater constituent, as well as monitoring for metals, organic chemicals, and other parameters.  Furthermore, the Forest Service also retained experts in hydrogeology to evaluate the effects of reclaimed water use on the quantity and quality of groundwater.  In sum, the Court determines that the agency took a hard look at the effects of using Class A+ reclaimed water to make artificial snow at the Snowbowl.

### 4.    Opposing Scientific Viewpoints

The Plaintiffs claim that the Forest Service failed to consider certain scientific evidence about the use of reclaimed water.  Specifically, the Plaintiffs contend that the Forest Service failed to adequately discuss and disclose the results of the studies conducted by the United States Geological Survey ("U.S.G.S.") and Dr. Catherine Propper and the report submitted by Dr. Paul Torrence.[9]  The Defendants and Intervenor maintain that the Forest Service adequately evaluated and responded to all reasonable opposing scientific viewpoints submitted during the NEPA process.

The Council on Environmental Quality's ("CEQ") regulations delineate the analysis that environmental impact statements must contain.  Specifically, the agency "shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised."  40 C.F.R. § 1502.9(b); Center for Biological Diversity, 349 F.3d at 1167. This disclosure requirement obligates the agency to make available to the public high quality information, including accurate scientific analysis and expert agency comments, before

---

[9]Dr. Catherine Propper, Ph.D., is an Associate Professor in the Department of Biological Sciences at Northern Arizona University ("NAU").  Dr. Paul Torrence holds a Ph.D. in organic chemistry and is a Professor of Chemistry and Biochemistry at NAU.  He is also a Full Investigator at the Arizona Cancer Center in Tucson.  Both individuals submitted comments during the public scoping process concerning the potential health and environmental impacts of using reclaimed wastewater for snowmaking.

decisions are made and actions are taken.  40 C.F.R. § 1500.1(b).  Furthermore, "an agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints."  <u>Earth Island Institute v. U.S. Forest Service</u>, 351 F.3d 1291, 1301 (9th Cir. 2003).  "Because analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies."  <u>Id.</u>  "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive."  <u>Marsh</u>, 490 U.S. at 377.

In this case, the record demonstrates that the agency evaluated and disclosed the research by Dr. Propper.  For example, the FEIS explains that Dr. Propper "conducted in vitro (test tube) and in vivo (whole body) tests of Flagstaff wastewater effluent to evaluate vertebrate behavior and physiological effects on the endocrine system."  In addition, her project proposal and the results of her research are included in the Administrative Record. The Forest Service included within the FEIS the conclusion that the "proposed use of reclaimed water for snowmaking at the Arizona Snowbowl will not result in comparable environmental exposure as investigated by Dr. Propper."  Based on the Forest Service's analysis and disclosure of Dr. Propper's research, the Court cannot conclude that the agency violated NEPA.

In addition, the Forest Service also responded to the concerns voiced by Dr. Torrence within the FEIS.  Dr. Torrence's comments made in response to the DEIS all focus on variations of the same allegation: that the agency failed to fully consider the range of implications of endocrine disruptors that may be present in reclaimed water.  However, a review of the FEIS reveals that the Forest Service considered the presence of synthetic organic chemicals from pharmaceutical and personal care products in water and the potential that some of the compounds will impact the endocrine system in wildlife and humans.  The Forest Service explained that "[r]ecent research indicates that endocrine disruptors have aquatic habitat impacts, but no health impacts, at concentrations found in receiving waters."

The FEIS explains that the agency's analysis of this issue was based on its review of recent studies, as well as the Global Assessment on the State-of-the Science of Endocrine Disruptors, a report prepared by an expert panel on behalf of the World Health Organization.

The Court is satisfied that the Forest Service properly evaluated and disclosed all comments and reasonable opposing scientific viewpoints that were available during the NEPA process.  Even if the Court were to find the viewpoints of Dr. Propper and Dr. Torrence more persuasive than the Forest Service's interpretation of the overall scientific evidence, that would not be enough to declare the agency's decision arbitrary and capricious. As indicated above, the Court is obligated to defer to the responsible federal agency's informed assessment of the scientific evidence.

### 5.    Failure to Make Decisional Materials Available

The Plaintiffs also argue that the Forest Service violated NEPA by failing to make decisional materials publicly available before its final decision was rendered.  It is undisputed that the Forest Service was required to supplement the Snowbowl Project Record with certain documents that were part of the decision-making process.  These documents – which included the Forest Service Plan and various letters sent to the tribes about the National Register nomination of the Peaks – were all referenced in record documents, even though they were not initially designated as part of the project record.  Accordingly, any person seeking the information referenced or described in the project record would be aware of their existence.  Under NEPA, an agency is required to "[m]ake environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act ["FOIA"]."  40 C.F.R. § 1506.6(f).  The Court concludes that the Forest Service complied with this provision.  As the Forest Service points out, all of the documents that were subject to release under FOIA were available upon request at any time during the NEPA process, and the Plaintiffs have offered no evidence to the contrary.

**B.     National Historic Preservation Act**

The Plaintiffs argue that the Forest Service did not comply with its obligations under the NHPA.  For example, the Plaintiffs contend that the tribes did not have a reasonable opportunity to participate in the resolution of the adverse effects of the proposed action.  In addition, the Plaintiffs assert that the timing of the completion of the Memorandum of Agreement ("MOA"), before the end of the NEPA process, suggests that a NEPA decision had already been reached rendering the NHPA consultation inadequate.

The NHPA directs federal agencies to consider the effects of their undertakings on historic properties included in or eligible for inclusion in the National Register of Historic Places and to consult with certain parties before moving forward with an agency action.  16 U.S.C. § 407f; see 36 C.F.R. § 800.1.  Regulations implementing the NHPA have been adopted by the Advisory Council on Historic Preservation ("ACHP").  The general procedure set forth in the applicable regulations requires an agency as early as possible, and in any event before taking any action that would foreclose the ACHP's ability to comment, to identify any National Register or eligible property located within the area of the undertaking's potential environmental impact which may be affected by the undertaking.  36 C.F.R. § 800.4.  The agency must then determine the effect of a proposed undertaking on any National Register or eligible property.

An effect occurs (1) "whenever any condition of the undertaking causes or may cause any change, beneficial or adverse, in the quality of the historical, architectural, archeological or cultural characteristics that qualify the property for the National Register," or (2) when an undertaking "changes the integrity of location, design, setting, materials, workmanship, feeling, or association of the property" that contributes to its historic significance.  36 C.F.R. § 800.3(a) and (b); Colorado River Indian Tribes v. Marsh, 605 F. Supp. 1425, 1435 (D. Cal. 1985).

When an effect is identified, the agency, in consultation with the State Historic Preservation Office ("SHPO"), must determine whether the effect would be adverse.  This

process includes applying the criteria of adverse effect, which includes: (1) destruction or alteration of all or part of a property; (2) isolation from or alteration of a property's surrounding environment; (3) introduction of visual, audible, atmospheric elements that are out of character with the property or alter its setting . . . . 36 C.F.R. § 800.3(b); <u>Colorado River Indian Tribes</u>, 605 F. Supp at 1435.

If the agency finds an adverse effect, then it must (1) prepare a Preliminary Case Report requesting the comments of the ACHP, (2) notify the SHPO of this request, and (3) undertake the consultation process set forth in § 800.6.  <u>Colorado River Indian Tribes</u>, 605 F. Supp. at 1435.  Under the consultation process set forth in § 800.6, the agency, the SHPO, and the Executive Director of the ACHP are the consulting parties who must "consider feasible and prudent alternatives to the undertaking that could avoid, mitigate, or minimize adverse effects on a National Register or eligible property.  36 C.F.R. § 800.4(d).  The consulting parties must then execute a MOA either specifying how the adverse effects will be avoided or mitigated, or acknowledging that they cannot be avoided or mitigated and specifying any recording, salvage, or other measure to minimize the adverse effects that shall be taken before the undertaking proceeds.  <u>Id.</u>  Although other parties may be invited to sign the MOA as well, their participatory signature is not required under the applicable regulations.  <u>Id.</u> at 800.6(c)(2).  Once the MOA is "executed and implemented pursuant to [the ACHP regulations]" it evidences the agency official's compliance with § 106 of the NHPA.  <u>Colorado River Indian Tribes</u>, 605 F. Supp. at 1436.

For the Snowbowl project, the agency ultimately made a "Finding of Adverse Effect." Accordingly, the record demonstrates that the agency then sought ways to avoid, minimize or otherwise mitigate the adverse effects that were associated with each of the three alternatives under consideration.[10]  Furthermore, the record is replete with agency efforts to

_____

[10]For example, the agency has guaranteed traditional cultural practitioners access within and outside the SUP as well as free use of the ski lifts in the summer.  The agency has also committed to working to protect any plants of traditional importance that may be subsequently identified in the

involve the tribes in the resolution of those identified adverse effects.[11]  For example, three separate letters were sent out and three sets of phone calls were made specifically requesting tribal input on the resolution of the adverse effects.  These communications also included invitations for the tribes to meet and discuss the MOA.  The record also reveals that the Forest Service sent each tribe a draft MOA along with an invitation to participate as a consulting party in further developing the agreement.

Ultimately, the Forest Service's consultation efforts resulted in the execution of a MOA among the required parties.  Four Indian tribes, including two named Plaintiffs in this case, the Hualapai and the Yavapai-Apache Nation, also signed the MOA.  The MOA adequately describes the steps to mitigate the potential adverse effects of the proposed projects; therefore, it fully satisfied the Forest Service's obligations under the NHPA.[12]  The MOA includes steps that the Forest Service and ASR must take regardless of which alternative was ultimately chosen, including the obligation to continue to consult tribes to mitigate any adverse effects and to continue to guarantee access to the Peaks for traditional cultural activities.  Among other things, the MOA requires: (1) access before, during and after construction; (2) protection and regeneration of plants of traditional importance; (3) that the Forest Service must work to ensure that current ceremonial activities continue

_____

project area.  Also, to the extent practicable, the Forest Service has indicated that the final location of new ski trails will use previously-disturbed areas.

[11] Throughout the tribal consultation process, the Forest Service made over 200 phone calls, held 41 meetings, and exchanged 245 letters with tribal representatives.  Although the consultation process did not end with a decision the tribal leaders supported, this does not mean that the Forest Service's consultation process was substantively and procedurally inadequate.

[12] The consultation process with the tribes did result in changes to the proposed action.  For example, the Snowbowl's request to have night lighting at the facility was not approved by the Forest Service, in part, due  to Tribal comments and religious concerns that authorizing night lighting would not permit the Peaks to rest at night.  However, as the Plaintiffs point out, the removal of night lighting from the project proposal also addressed the fact that Flagstaff is a dark sky city.  Furthermore, the Forest Service found that night lighting did not meet the purposes and needs for the project.

uninterrupted; (4) that the Forest Service must protect shrines; (5) that tribes must be provided water-quality information; and (6) where practicable, projects must take advantage of previously-disturbed areas.  Furthermore, the MOA also permits periodic inspections by tribal representatives, including prior to construction in order to minimize the impact of the pipeline route.

With respect to the Plaintiffs' argument regarding the timing of the completion of the MOA, the Court finds it unpersuasive.  As the Defendants point out, NHPA encourages agencies to combine the consultation efforts with the NEPA process.  36 C.F.R. § 800.8.  Nomination of a specific  historic property to the National Register is a separate process that need not be complete in order for the agency to meet its consultation obligations under the NHPA.

The Court finds it important to note that consultation on the proposed Snowbowl improvements formally began in 2002 and spanned a two year period; however, the Forest Service has been consulting with approximately 13 tribes or chapters about the religious and cultural significance of the Peaks since at least 1970.  The record indeed demonstrates that the Forest Service made extensive, good faith efforts to seek tribal input on the religious and cultural significance of the Peaks, and provided a reasonable opportunity for the tribes to participate in the resolution of the proposal's potential adverse effects.

### C.    National Forest Management Act

The Plaintiffs claim that the Forest Service failed to ensure the viability of native species in the project area in violation of the National Forest Management Act, 16 U.S.C. §§ 1600-1687.  Specifically, the Plaintiffs contend that the agency failed to adequately address potential impacts on certain management indicator species ("MIS").  For example, the Plaintiffs maintain that the Forest Service was required to collect population data from the project area for three MIS (Abert and red squirrels and the pygmy nuthatch).  However, the Forest Service responds that the agency was not required to collect population data on these MIS in the Snowbowl area at all and satisfied NFMA by using the most up-to-date data

available to assess the potential impacts on forest-wide habitat and trends for the MIS.  The Forest Service contends that it carefully evaluated the potential effects of the proposed activities and determined that the project would not harm MIS or other wildlife.

The Court concludes that the Defendants satisfied NFMA's requirements by complying with the Coconino Forest Service Plan direction related to MIS.  The currently applicable Forest Service regulations specify that pending revision of Forest Plans, National Forests have the option to utilize habitat data as to any obligation regarding MIS.  36 C.F.R. § 219.14(f).  Furthermore, population monitoring is required only when the Forest Service Plan so provides.  Id.  Accordingly, a review of the FEIS shows that the Forest Service analyzed the effects of the Snowbowl alternatives on forest-wide habitat and trends for the MIS.  The Forest Service concluded that, under the selected alternative, habitat modifying activities within the SUP area "would not alter habitat for MIS outside the SUP area."  As pointed out by the Forest Service, the Forest Service Plan does not require the Forest Service to evaluate the impacts of the proposal on MIS because there are no MIS assigned to the management area where the Snowbowl is located.  However, the Court finds that the Forest Service did conduct a thorough assessment of the effects of the proposed reclaimed water pipeline on MIS in MAs 3, 4, 5 and 9 as the pipeline will cross those management areas.

### E.    Grand Canyon Enlargement Act

In their ninth claim for relief, the Havasupai Plaintiffs allege that the Forest Service violated the GCEA "by permitting an activity that will detract from the existing scenic and natural values of . . . lands [transferred to the Havasupai Tribe pursuant to the GCEA], [and] failing to keep them 'forever wild.'"  Specifically, the Plaintiffs assert that the lands transferred to the Havasupai Tribe will be "directly impacted by the spring melt from the Snowbowl's snow made from reclaimed water."  However, because the Plaintiffs misconstrue the GCEA, summary judgment on this claim is granted in favor of the Defendants.

As part of the GCEA, "Congress declared that an additional 185,000 acres were to be held in trust enlarging the reservation of the Havasupai Tribe."  Havasupai Tribe v. United

<u>States</u>, 752 F. Supp. 1471, 1483 (D. Ariz. 1990) (citing 16 U.S.C. § 228i(a)).  However, the plain language of the GCEA and the legislative history described in the <u>Havasupai Tribe</u> opinion demonstrate that the GCEA does not impose any limitations on the government's uses of other lands and cannot be read to restrict activities on lands outside the Havasupai reservation.  752 F. Supp. at 1471.  As such, the Defendants are entitled to summary judgment on the Plaintiffs' GCEA claim.

### F.   Endangered Species Act

In its tenth claim for relief, the Hopi Plaintiffs allege that the Forest Service violated the ESA in its approval of the proposed project.  However, prior to asserting such a claim in the district court the Plaintiffs were required to have first provided written notice of the alleged violation to the Secretary of the Interior sixty days in advance of filing suit.  16 U.S.C. § 1540(g)(2)(A)(i).  Since the Hopi Plaintiffs did not provide such notice, this Court is without the jurisdiction to consider the claim.  <u>See</u> <u>Southwest Center for Biological Diversity v. Bureau of Reclamation</u>, 143 F.3d 515, 520-22 (9th Cir. 1998); <u>Save the Yaak Comm. v. Block</u>, 840 F.2d 714, 721 (9th Cir. 1988) (holding that 60-day notice requirement was not met and the ESA claim must be dismissed for lack of jurisdiction).  Accordingly, the Court grants summary judgment in the Defendants' favor on this particular claim.

### G.   Breach of Trust Claim

The Plaintiffs allege that the issuance of the Snowbowl SUP constitutes a violation of the government's trust responsibility to the tribes.  Although it is undisputed that the United States is indeed a trustee for the tribes, at issue in this case is whether that trust imposes any additional enforceable fiduciary duties upon Defendants with regard to the issuance of the SUP beyond compliance with generally applicable regulations and statutes. Based on the governing law, the Court concludes that no such additional trust duties exist. Although there may be a general fiduciary duty of the federal government owed to the tribes, "unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations

and statutes not specifically aimed at protecting Indians." <u>Morongo Band of Mission Indians v. FAA</u>, 161 F.3d 569, 574 (9th Cir. 1998).  Because this case does not involve tribal property, the Forest Service's duty to the tribes is to follow all applicable statutes.[13]  <u>Id.</u>  Since the Court has found that the agencies did not violate any statutes during the approval for the Snowbowl project, the agency satisfied its fiduciary duty to the local tribes.[14]

### D.    Religious Freedom Restoration Act

Pursuant to RFRA, the Plaintiffs seek declaratory and injunctive relief that would: (1) declare that the selected alternative, as approved, violated RFRA; and (2) stop the Forest Service and ASR from taking steps in furtherance of the selected alternative.  According to the Plaintiffs, the proposed upgrades to the Snowbowl, particularly the use of reclaimed water to make snow, will have negative, irreversible, and devastating effects to their religious, traditional and cultural practices.  However, the Defendants and ASR assert that since there is no evidence that the decision will exclude tribal practitioners from the Peaks, no evidence of any diminution of access, no inability to collect medicinal or ceremonial plants and other materials, and no prohibition on holding religious ceremonies anywhere on the Peaks, there is, consequently, no substantial burden on the exercise of the Plaintiffs' religion.

---

[13]The Havasupai Plaintiffs specifically argue that the Defendants breached their trust obligations by allegedly compromising the quality of the tribe's water, in violation of the GCEA.  However, the Court previously concluded that the Plaintiffs have failed to state a violation of the GCEA and thus cannot use this statute to support its trust claim.

[14]The Navajo and Hualapai Plaintiffs both assert that the Forest Service has violated its trust responsibilities by failing to comply with certain Executive Orders; however, since these Executive Orders are not independently enforceable, such claims have no merit.  The Executive Orders cited by the Plaintiffs expressly state that they "are intended only to improve the internal management of the executive branch" and do not create any trust responsibility or right to judicial review.  <u>See</u> Exec. Order No. 12,898, 59 Fed. Reg. 7629, 7632-33 (Feb. 11, 1994) (provision 6-609; Exec. Order No. 13,007, 61 Fed. Reg. 26771, 26772 (May 24, 1996 (Sec. 4); Exec. Order No. 13,175, 65 Fed. Reg. 67429, 67252 (Nov. 6, 2000) (Sec. 10).  Furthermore, the FEIS documents that the Forest Service considered these Executive Orders.

Although the parties all moved for summary judgment on their RFRA claims, the Court concluded that the claims were not suitable for disposition on summary judgment. Due to the necessity for the Court to make various factual findings, a bench trial was held to determine whether the proposed action placed a substantial burden on the Plaintiffs' exercise of their religion.  Having reviewed the Administrative Record filed in this matter, the pleadings, annexed declarations and exhibits on the cross-motions for summary judgment, and having heard argument of counsel and testimony during an eleven-day bench trial, the Court makes the following findings of fact and conclusions of law.[15]

**1.      Findings of Fact**

**a.      The Arizona Snowbowl and the San Francisco Peaks**

1.    The San Francisco Volcanic field covers approximately 1,800 square miles of northern Arizona.  The field lies along the southern perimeter of the Colorado Plateau, defined by the Mogollon Rim to the south of Flagstaff.  The most prominent peak within the field is Humphrey's Peak.  At 12,633 feet, Humphrey's Peak is the highest point in Arizona.

2.    Collectively, Humphrey's Peak, Agassiz Peak (12,356 feet), Doyle Peak (11,460 feet), and Fremont Peak (11,696 feet) are identified on the USGS maps as the San Francisco Mountain.  However, the mountain is more commonly referred to as the San Francisco Peaks and is identified as such herein.

3.    The  Snowbowl ski area is located in the CNF in Northern Arizona which comprises 1.8 million acres of public land.  Specifically, the Snowbowl lies on the western flank of the San Francisco Peaks ("Peaks").

4.    The  Peaks cover approximately 74,000 acres of public land, and the ski area constitutes about one percent (1%) of the mountain.

---

[15]   The Court is aware that many of the findings made in the RFRA section of this opinion were previously mentioned within the Court's analysis regarding the counts subject to summary judgment.  However, the Court chose to reiterate findings that were also pertinent to the RFRA claims despite the redundancy.

5.    The Peaks are extensively documented and widely recognized as a place of cultural importance to the Hopi, Navajo, and other tribes that are Plaintiffs in this case.  For years, the Forest Service has recognized the cultural and religious significance of the Peaks to the tribes of the southwestern United States.

6.    The Forest Service has identified the Peaks as a Traditional Cultural Property ("TCP") as defined in the National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties.[16] The Peaks have also been determined as eligible for inclusion on the National Register of Historic Places.

7.    The Snowbowl SUP area is surrounded on three sides by the Kachina Peaks Wilderness area, designated by Congress in 1984.

8.    Arizona Snowbowl Resort Limited Partnership ("ASR"), the Intervenor, is the current owner and operator of the facilities located within the Snowbowl SUP.  The Snowbowl is operated under a 777-acre SUP which was issued to ASR by the Forest Service in 1992 pursuant to the National Forest Ski Area Permit Act of 1986, 16 U.S.C. § 497b.

9.    The Forest Service has designated the Snowbowl as a public recreation facility under the Coconino Forest Service Plan.  In doing so, the Forest Service found that the Snowbowl represented an opportunity for the general public to access and enjoy public lands in a manner that the Forest Service could not otherwise offer in the form of a major facility anywhere in Arizona.

---

[16]A TCP is a place that is associated with the cultural practices or beliefs of a living community.  Those practices or beliefs must be rooted in the history of the community and be important in maintaining the continuing cultural identity of the community.  While not all TCPs are eligible for the National Register, a TCP is eligible if the property plays a role in a community's historically rooted beliefs, customs and practices and meets one of four National Register Criteria for significance: (A) is associated with significant events; (B) is associated with a significant person; (C) is an outstanding example of a type; or (D) is associated with information contained in an archaeological site.

10.   The Snowbowl is the only area dedicated as a downhill ski resort within the CNF. Furthermore, the Coconino Forest Service Plan was approved in 1987 after a separate Environmental Impact Statement process that included public involvement and comment.

11.   In addition to downhill skiing, numerous activities are conducted on the Peaks, consistent with the Coconino Forest Service Plan and multiple-use requirements, including sheep and cattle grazing, timber harvesting, road building, mining (including cinder pit mining), gas and electric transmission lines, water pipelines, cellular towers, motorcross, mountain biking, horseback riding, hiking and camping.

12.   The Snowbowl serves a growing population in Arizona based primarily in the Phoenix metropolitan and northern Arizona areas.  The Snowbowl is an important public recreational resource of the CNF.

13.   Skiing has occurred in the Snowbowl area since the 1930s.

14.   In 1979, the Forest Service conducted an extensive process pursuant to the EPA to evaluate proposed upgrades to the Snowbowl, which included the installation of new lifts, trails and facilities.  The 1979 Forest Service decision approved 206 acres of skiable terrain and facilities to support a comfortable carrying capacity of 2,825 skiers.

15.   The Forest Service's 1979 decision to approve the Snowbowl upgrades was challenged in the courts by several Indian tribes.

16.   In Wilson v. Block, 708 F.2d 735 (D.C. Cir. 1983), cert. denied, 464 U.S. 956 (1983), the Court upheld the Forest Service's decision and found that the project did not substantially burden the tribes' exercise of religion.  In addition, the Court upheld the more general question of whether to permit skiing in the area.  Since the Wilson decision, the tribes have continued to use the Peaks for religious purposes.

17.  Over the last several years, the Snowbowl has experienced highly variable snowfall and associated extreme variability in skier visits, resulting in financial deficits over many years and daunting operational issues.

18.  Due to its age, many of the existing ski runs at the Snowbowl area are old, steep and narrow which raise ample safety concerns.  Likewise, other Snowbowl upgrades are needed to increase the amount of intermediate terrain to spread skiers out and eliminate congestion.

     **b.**  **The Forest Service Decision and the Snowbowl Upgrades**

19.  In 2002, ASR initiated the process of having the Forest Service approve upgrades to the existing ski area, which included a proposal for snowmaking.  Shortly thereafter, in June of 2002, the Forest Service began its screening process to develop a Proposed Action.

20.  Prior to notifying the general public about the proposed upgrades at the Snowbowl in September of 2002, the Forest Service sought input from the tribes.

21.  After the proposed action was released to the general public, the Forest Service continued to consult with the tribes, in order to determine the potential or perceived impacts of the proposed facilities improvements to the Snowbowl.  The Forest Service made more than 500 contacts with tribal members as part of the Snowbowl consultation process, including between 40 and 50 meetings.

22.  After the Forest Service formally accepted the ASR proposal in September of 2002, the agency initiated the National Environmental Policy Act ("NEPA") scoping process by releasing the proposed action to the general public on September 23, 2002.  The Forest Service mailed the NEPA scoping notice to hundreds of community residents, interested individuals, Indian tribes, public agencies, and other organizations.

23.  As a result of the NEPA scoping notice, approximately 1,200 comment letters were received and evaluated by the Forest Service.

24.   The Forest Service released the Draft Environmental Impact Statement ("DEIS") to the public, including the Plaintiff tribes, on February 2, 2004, and announced that the preferred alternative included snowmaking with Class A+ reclaimed water from the City of Flagstaff's Rio de Flag Water Reclamation Plant.

25.   As a result of the DEIS, the Forest Service received and evaluated close to 9,900 comments.

26.   As part of its environmental analysis, the Forest Service gave detailed consideration to three alternatives: the No Action Alternative (Alternative One); the Preferred Alternative (Alternative Two): and a no snowmaking alternative (Alternative Three).

27.   The Forest Service found that Alternative Two best met the purposes and needs of the proposed action.

28.   The Forest Service considered at least nine additional alternatives, including: reducing the level of snowmaking, fewer upgrades, closing the Snowbowl altogether, and using potable water rather than reclaimed water for snowmaking.  The Forest Service determined that these alternatives did not warrant detailed evaluation, or were not feasible.

29.   In February of 2005, the Forest Service issued the Final Environmental Impact Statement ("FEIS") and the Coconino National Forest Supervisor signed the Record of Decision ("ROD") approving Alternative Two.

30.   The Plaintiffs appealed the Forest Supervisor's decision on April 25, 2005. Accordingly, the Forest Service's Southwestern Regional Office arranged a technical review team to evaluate the administrative appeals.

31.   On June 8, 2005, the Forest Service responded to and denied these appeals.  In pertinent part, the Forest Service denied Plaintiffs' claims that the project would have a substantial burden on their ability to practice their religion.

32.   Under the ROD, the Snowbowl facilities improvements include realignment and/or lengthening of three existing chair lifts; installation of one new chair lift and four

surface lifts; development of new ski terrain, increasing the ski acreage within the SUP area from approximately 138 acres to approximately 204 acres; development of a new snowplay/tubing area, with associated improvements to parking and guest service facilities; installation of snowmaking infrastructure to cover approximately 204 acres of the SUP; and improvements to other service facilities and ski area infrastructure, such as lodges.

33.    With the exception of the snowplay facility and the snowmaking, the infrastructure improvements authorized by the Forest Service are comparable to those first authorized by the Forest Service in 1979 and upheld in <u>Wilson</u>.  For example, the 2005 Snowbowl decision and the 1979 decision both approved about 205 acres of skiable terrain and facilities to comfortably support 2,825 skiers at one time.

34.    The authorized skiable terrain remains at just over 200 acres and the Snowbowl's comfortable carrying capacity ("CCC") remains unchanged at 2,825 skiers at one time, as previously approved by the Forest Service in 1979.

35.    The area proposed for snowmaking is approximately one quarter of one percent (1%) of the Peaks.

36.    All authorized improvements will occur within the existing 777-acre SUP area, with the exception of a 14.8 mile buried reclaimed water pipeline that will be constructed within existing road or utility right-of-ways.

37.    The pipeline will also be equipped with fire hydrants to provide a water source for fire suppression needs within the rural residential areas between Flagstaff and the ski area as well as to fight forest fires.  Likewise, a reservoir of water will be maintained at the ski area and will be available for forest fire suppression.

38.    The snowplay facility will address safety issues associated with snowplay on the trails within the SUP that conflicts with downhill skiers, as well as unmanaged snowplay and unauthorized parking along Snowbowl Road that the Forest Service has had a long time interest in addressing.

39.   The upgrades to existing trails and other features, including snowmaking, will improve safety conditions and minimize the potential for accidents at the Snowbowl.

40.   The snowmaking component of the Snowbowl upgrades includes the use of reclaimed water from the Rio de Flag WRF.  The WRF is a tertiary water reclamation facility, also known as an advanced treatment facility.

41.   To ensure that reclaimed water is used safely without adversely affecting public health or environment, the Arizona Department of Environmental Quality ("ADEQ") has established five water categories (A+, A, B+, B, C) specifying the minimum levels of treatment and water quality criteria.

42.   Reclaimed water that has been treated at the WRF is categorized as Class A+ water, which is the highest quality of reclaimed water classified by the ADEQ.

43.   The Class A+ water proposed to be used in the snowmaking by the Snowbowl is therefore the highest grade of reclaimed water recognized under Arizona statutes and regulations.  Class A+ reclaimed water has been approved for use in snowmaking by the ADEQ.

44.   The level of treatment and the water quality criteria required for use of reclaimed water depends upon the expected degree of human, animal, and plant contact. Pursuant to the ADEQ's regulations, the reclaimed water to be used at the Snowbowl will undergo specific advanced treatment requirements, including tertiary treatment with disinfection.   In addition, the reclaimed water will comply with specific monitoring requirements, including frequent microbiological testing to assure pathogens are removed, and reporting requirements.

45.   Reclaimed water from the WRF is subject to a variety of tests to ensure that the water is adequately treated to remove bodily fluids, such as blood.

46.   Reclaimed water from the WRF must comply with extensive treatment and monitoring requirements under three separate permit programs: the Arizona Pollutant Discharge Elimination System ("AZPDES") Permit, the Arizona Aquifer Protection

Permit Program, and the Water Reuse Program.  Additionally, industrial facilities in the City of Flagstaff are required to comply with the city's Industrial Pre-Treatment requirements.

### c.   Plaintiffs' Religious Beliefs and Practices on the Peaks

47.   Certain Indian religious ceremonies are conducted on the Peaks, such as the Navajo Blessingway Ceremony, and certain plants, water and other materials are collected from the Peaks for Navajo medicine bundles and other tribal healing ceremonies.

48.   The Plaintiff tribes believe that the Peaks is a living entity and that the presence of the Snowbowl desecrates the mountain.

49.   Certain practitioners believe that the alleged desecration of the Peaks has caused many ills to mankind, including attacks on 9/11/01, the Columbia Shuttle crash, and the increase in natural disasters, such as recent hurricanes, tornados, and the tsunami.

50.   Certain practitioners believe that upgrades to the Snowbowl will result in further ills and will harm their beliefs.

51.   Certain practitioners believe that upgrades to the Snowbowl will jeopardize the continuation of their religion.

52.   Native practitioners also believe that certain deities, such as Kachina or Ga'an, dwell on the Peaks, and that snowmaking (irrespective of the source of water) will negatively impact the deities, potentially causing drought or other suffering.

53.   Certain practitioners also believe that the Class A+ reclaimed water from the City of Flagstaff to be used for snowmaking contains the souls of the dead because the city hospital, morgue and mortuary contribute minor amounts to the discharge from the Rio de Flag WRF and that the use of the reclaimed water will affect the purity of the Peaks.

54.   Although the Indian tribes and their members differ in their use of the Peaks for religious purposes and have different views on how to best manage the area, the Plaintiff tribes and their members do hold the uniform beliefs that the Peaks are sacred,

and this project should not be allowed to move forward to further desecrate their sacred mountain.[17]

55.   The Plaintiff tribes have not identified any shrines, trails or cultural resources located within the 777-acre SUP area.

56.   The Plaintiff tribes acknowledged that they have shrines and specific places where ceremonies are conducted in other areas on the Peaks, including within the Kachina Peaks Wilderness area.

57.   Tribal beliefs, ceremonies and practices have not changed since 1983 when some of the upgrades authorized by the 1979 Forest Service decision were implemented.

58.   The Forest Service called two archaeologists as witnesses: Dr. Judith Propper and Heather Provencio.  Dr. Propper and Ms. Provencio discussed their understanding of how the tribes subjectively perceive the Snowbowl project.  Dr. Propper is the Regional Archaeologist for the Southwestern Region of the Forest Service.  Ms. Provencio is the Forest Service Zone Archaeologist for the Peaks and the Mormon Lakes Districts; She was the lead archaeologist for the tribal consultation on the Snowbowl proposal.

59.   Dr. Propper agreed that the tribes view the Peaks: (a) as a home of spiritual beings; (b) a place where significant mythological events occurred; (c) a place where spirits of the dead went to be changed into bringers of rain; (d) a personification of gods and goddesses; (e) an area where important societies originated; and (f) as a source of life.

60.   Dr. Propper testified that although practitioners sincerely felt that the Forest Service decision would impact their beliefs and exercise of religion, the impacts did not amount to a substantial burden.

61.   Ms. Provencio testified that the types of Native American religious practices that occur on the Peaks range from the collection of traditional plants, for ceremonial, traditional

---

[17]While there is evidence to suggest that the Peaks may be more sacred to some of the tribes than to others, the Court need not make such a finding.

and medicinal use, to members actually conducting healing ceremonies and religious ceremonies on the Peaks.

### i. Navajo Plaintiffs

62.    The Navajo Nation has approximately 225,000 members and is the largest federally recognized Indian Tribe in the United States.  The Navajo Nation covers the corners of three states, Arizona, New Mexico and Utah, consisting of 27,635 square miles.  The Navajo Nation lies to the north and east of the Peaks.

63.    Navajo Nation President, Joe Shirley,  the Historic Preservation Department Assistant Manager, Steven Begay, and Larry Foster, member of the Navajo Nation,  testified on behalf of the Navajo Nation.

64.    The Peaks are one of four mountains sacred to the Navajo people.  In the Navajo religion, the creation of the Navajo people took place at the Peaks.  Accordingly, the Peaks are considered in Navajo culture and religion to be the "Mother of the Navajo People," their essence and their home.  The whole of the Peaks is the holiest of shrines in the Navajo way of life.

65.    The Peaks are home to many of the Navajo people's deities, including White Corn Girl, White Corn Boy, Twilight Girl, Twilight Boy, and Yellow Wind.

66.    The Snowbowl upgrades will not interfere with or inhibit any religious practice of the Navajo Plaintiffs.  Although the witnesses generally testified that the Peaks were central and indispensable to the Navajo way of life, President Shirley and Mr. Begay provided no evidence that they use the Snowbowl SUP area for any religious purpose.

67.    The Snowbowl SUP area is not the exclusive site of any Navajo religious activities.  All plants and wildlife used by the Navajo Plaintiffs for religious purposes are available outside the SUP area.

### ii. Plaintiff Norris Nez ("Plaintiff Nez")

68.    Plaintiff Nez is a Navajo medicine man who testified as a named Plaintiff.

69.   The SUP area is not the exclusive location for any religious activities.  All plants and wildlife that Mr. Nez uses for religious purposes are available outside of the SUP and, in fact, Mr. Nez collects plants outside of the SUP area.

70.   Mr. Nez has never been denied access to any part of the Peaks in relation to the practice of his religion.

71.   The Snowbowl upgrades will not inhibit the religious practices of traditional Navajo practitioners or prevent Plaintiff Nez from engaging in religious conduct.

### iii.  White Mountain Apache Plaintiffs

72.   The White Mountain Apache ("WMA") is a federally recognized Indian tribe with more than 12,600 members.  The reservation is located in east central Arizona in portions of Navajo, Apache and Gila counties.  It measures 75 miles long and 45 miles wide, comprising more than 1.6 million acres.

73.   The WMA Plaintiffs presented testimony of Ramon Riley, the Cultural Resource Director for the WMA  and Dallas Massey, the Chairman of the WMA, neither of whom have ever been to the Snowbowl SUP area.

74.   The four mountains sacred to the WMA are the Black Mountain (Mount Baldy), the Turquoise Mountain (Mount Graham), the Red Mountain (Four Peaks), and the White Mountain (the San Francisco Peaks).

75.   Two of the religious ceremonies in which the Peaks play a role are the Sunrise Ceremony and the ceremonies performed by Crown Dancers.  The Sunrise Ceremony is a right of passage for young ladies who go from adolescence to womanhood.  The Crown Dancers perform healing ceremonies "used to heal people."

76.   Mr. Riley testified that the proposed project will have a large negative impact on the ability of the Apache people to perform the Sunrise Ceremony allowing a young lady to pass into womanhood and the Crown Dancer ceremonies.  "Some of the medicine people, including myself, will lose focus.  Our medicine [and] our prayers [are] not going to be strong."

77. Although Mr. Riley testified to the devastating impacts the Snowbowl upgrades will have on his culture, neither he nor the WMA Plaintiffs presented evidence that the Snowbowl upgrades will interfere with or inhibit any particular religious practice. For example, plants collected by the members of the WMA for religious purposes, such as "white medicine," are available throughout the Peaks.

78. Portions of the WMA reservation, considered sacred by tribal members, are dedicated to recreational uses. For example, the White Mountains, considered sacred to some members of the WMA, are home to the Sunrise Ski Resort that is owned and operated by the WMA.

79. The water used for snowmaking at Sunrise is derived from Ono Lake and is, in part, reclaimed water. Sunrise has a permit to discharge treated wastewater into Ono Lake.

80. The WMA are currently planning to expand the snowmaking capabilities at Sunrise.

81. Although there are technically four ski areas in the state of Arizona, Sunrise and the Snowbowl are the two largest.

82. The WMA Plaintiffs would prefer complete removal of the Snowbowl ski facilities. Specifically, the WMA Plaintiffs would oppose the Snowbowl upgrades even if fresh water was used to make snow. Moreover, the WMA Plaintiffs are opposed to any upgrades that would alter the terrain, even upgrades proposed for safety reasons.

### iv. Plaintiff Bill Bucky Preston (Plaintiff Preston)

83. Plaintiff Preston is a member of the Hopi Tribe who testified as a named Plaintiff in this case. During trial, Plaintiff Preston chose not to discuss his specific role in the Hopi community. Specifically, Plaintiff Preston was unable to disclose many of his specific religious beliefs due to their sacred nature.

84. Plaintiff Preston failed to demonstrate that the Snowbowl upgrades will interfere with or inhibit any religious practices that he may perform. In fact, Plaintiff Preston would not respond to questions about his specific religious activities.

85.   Plaintiff Preston does not conduct any religious activities within the SUP area. Plaintiff Preston testified that the Snowbowl's presence on the Peaks prevents him from doing so.

86.   All plants and wildlife that Preston uses for religious purposes are available outside the SUP area.  In fact, Plaintiff Preston collects plants and wildlife outside the SUP area.

### v.  Hualapai Plaintiffs

87.   The Hualapai Tribe is a federally recognized Indian tribe with more than 1,500 members.  The Hualapai Reservation, created by Executive Order in 1883, presently comprises approximately 185,000 acres in the Northwestern Arizona Counties of Coconino, Mojave and Yavapai.  The northern boundary of the reservation is the middle of the Colorado River within the Grand Canyon.  The Tribal Capitol is located in Peach Springs, Hualapai Reservation, Arizona, approximately 95 miles west of the Peaks.

88.   Frank Mapatis, a traditional practitioner and Charles Vaughn, Chairman of the Hualapai Tribe, testified on behalf of the Hualapai Tribe.

89.   The Hualapai Plaintiffs presented no evidence that they conduct religious activities within the SUP area.  All plants and wildlife that the Hualapai Plaintiffs use for religious purposes are available outside the SUP area.  In fact, the Hualapai Plaintiffs collect plants and wildlife outside the SUP area.

90.   Mr. Mapatis collects plants from the Peaks once a year as part of his religious beliefs, but he does not collect plants within the SUP area.

91.   Mr. Mapatis does not collect water from within the SUP area; however, Mr. Mapatis believes that water travels down the mountain, through the SUP area, to springs and seeps where water is collected for ceremonial purposes and for healing the sick.

92.   Mr. Mapatis does not leave offerings within the SUP area.

93. Previous forest management activities on the Peaks, such as road construction, cell tower construction, and the operation of sewage septic systems have not inhibited Mr. Mapatis' religious practices.

94. Since 1983, when the D.C. Circuit upheld the original EIS for the development of the Snowbowl ski area, the number of practitioners of the Hualapai Tribe's religion has increased.

95. The Hualapai Plaintiffs failed to demonstrate that snowmaking authorized by the Snowbowl upgrades will impact the water collected from the Peaks by traditional practitioners.

96. The Hualapai Plaintiffs did not present evidence demonstrating that members have ever been or will be denied access to the Peaks to conduct religious activities.

97. The Hualapai Tribe has undertaken activities that impact the religious practices of its own members.  For example, some members of the Hualapai Tribe oppose the Sky Walk Project, a multi-million dollar expansive recreational development project in the Grand Canyon, which is considered to be sacred.  As part of the Sky Walk Project, a tourist center will be built on the edge of the Grand Canyon along with a sky walk that extends over the canyon enabling visitors to look down into it.

   **vi.  Plaintiffs Havasupai Tribe, Rex Tilousi, and Diana Sue Uqualla**

98. The Havasupai are a federally recognized Indian tribe with over 600 enrolled members.  The Havasupai Reservation consists of 188,077 acres of canyon land and broken plateaus abutting  the western edge of the Grand Canyon's south rim.  The Havasupai Tribe's main village is Supai, and it is located in the bottom of the Grand Canyon.  A majority of the tribal members reside in Supai.

99. Havasupai Tribe Chairman Rex Tilousi ("Plaintiff Tilousi") and Havasupai Vice-Chair Diana Sue Uqualla ("Plaintiff Uqualla") testified as named Plaintiffs.  Roland Manakaja, Cultural Resources Director for the Havasupai Tribe, testified on behalf of the Havasupai Plaintiffs.

100.    The Peaks were included within the Havasupai Tribe's traditional territory, and they traditionally exercised caretaker responsibility for the Peaks which the other tribes in the region acknowledged.

101.    For the Havasupai, the Peaks are the origin of the human race; it is the point of their creation.  Specifically, they believe that the water from the Peaks impregnated their Grandmother by the Sun Father melting the snow on the Peaks.

102.    The Havasupai traditional practitioners pray to the Peaks and visit them spiritually daily.  Furthermore, traditional practitioners of the Havasupai religion deem the entirety of the Peaks as one living being and that portions of the mountain cannot be carved out from the whole.

103.    The Havasupai Plaintiffs believe that the act of snowmaking modifies the seasons and is considered a profane act; however, the Havasupai Plaintiffs did not present evidence that the Snowbowl project will inhibit the religious practices of the tribe or penalize members of the tribe for practicing their religion.

104.    The Havasupai Plaintiffs did not present evidence that any member of the tribe conducts religious or cultural activities within the SUP area.

105.    The Havasupai Tribe have gathered from the Peaks ceremonial items, food, water and fallen trees for fuel for hundreds of years and still use such articles today.  However, the Havasupai Plaintiffs did not present evidence that members collect plants, rocks, or trees from within the SUP area.

106.    The SUP area is not the exclusive location of any plants, such as aspen trees and pinyon pines, that Havasupai tribal members use for religious purposes.  Volcanic rocks that are collected for religious purposes are also widely available throughout the Peaks.  In addition, the SUP area is not the exclusive location for any wildlife that are used for religious purposes.

107.   The Havasupai Plaintiffs did not present evidence permitting the Court to find that water from the snowmelt at the Snowbowl ski area will go to Havasu Creek, over 60 miles away.

108.   Snowmelt at the Snowbowl ski area is highly unlikely to run off as surface water for any great distance.  Even if surface water were to run off from the Snowbowl ski area, it would flow mainly within the Little Colorado surface water drainage basin, the same basin where treated water from Rio de Flag is discharged.

109.   Snowmelt from the Snowbowl area that does not evaporate or sublimate is expected to infiltrate downward through the subsurface below the perched groundwater systems. The infiltrated snowmelt would not likely be a source of water to springs located downslope of the Snowbowl ski area.

110.   Snowmelt from the Snowbowl ski area that infiltrates the regional Coconino Aquifer ("C-Aquifer") would likely move north toward Blue Springs or toward the boundary of the groundwater drainage basin east of the Mesa-Butte fault, at which point the water would infiltrate down into the other regional aquifer known as Redwall-Muave Aquifer ("R-Aquifer").

111.   Groundwater within the R-Aquifer will not move across the Mesa-Butte fault because the uplifted westward side of the fault has a damming effect and because the movement of water along the fault in the northeast and southwest direction will direct the movement of water to the northeast and southwest, away from Supai Village.  The Mesa-Butte fault is a conduit for flow along the fault, causing water in the R-Aquifer to move along the fault - to the north, toward Blue Springs or south to the Verde area - away from Supai Village.

112.   Havasupai Plaintiffs, Plaintiff Tilousi, and Plaintiff Uqualla did not present convincing evidence to allow the Court to find that the quality of the water at Supai Village will be affected by the use of reclaimed water for snowmaking at the Snowbowl ski area.

113.   Water quality concerns at the Havasupai Tribe's reservation are unrelated to the Snowbowl upgrades.  There have been problems with the lagoon system that manages wastewater from within Supai Village.  The wastewater in the Supai Village lagoon system, which includes several unlined lagoons, does not receive any chemical or ultraviolet treatment.  Plaintiff Uqualla admitted that it is reasonably likely that the untreated wastewater in these unlined lagoons will infiltrate into the ground.

114.   Whereas Plaintiff Tilousi admitted that the Havasupai Tribe is most concerned with protecting Supai Village; the Havasupai Plaintiffs have used water reclaimed from this lagoon system to irrigate alfalfa sprout crops in Supai Village.

115.   The Havasupai Plaintiffs are currently interacting with the United States Environmental Protection Agency regarding the management of solid waste in Supai Village.  Previously, the Havasupai Plaintiffs buried or burned their solid waste trash, but have recently discovered that they must undertake a closure.[18]

116.   The Havasupai Plaintiffs, Plaintiff Tilousi, and Plaintiff Uqualla did not present evidence that the Snowbowl Upgrade Project will cause flooding in Supai Village.

### vii.  Hopi Plaintiffs

117.   The Hopi are a federally recognized Indian tribe with approximately 12,000 members.  The Hopi Reservation is located in the high deserts of northeastern Arizona and is surrounded by the Navajo Nation.  The Hopi Reservation measures 2,438 square miles.

118.   The Hopi Plaintiffs presented testimony from four witnesses: Cultural Preservation Office Director Leigh J. Kuwanwisiwma, Hopi practitioner Wilton Kooyahoma, Hopi practitioner Antone Honanie, and Research Archaeologist and Hopi practitioner Emory Sekaquaptewa.

---

[18]   The use of the term "closure" in the above finding of fact means the permanent closing of a landfill used to burn or bury solid waste.

119. The Hopi Tribe's spiritual and physical connection to the Peaks goes back as far as their oral traditions – at least as long as the Hopi and their ancestors have lived in northern Arizona.

120. The Peaks are of central importance to the Hopi tradition, culture and religion. There is a direct relationship between the Hopi way of life and the environment, including the Peaks. The Peaks mark a cardinal direction defining the Hopi universe, the spiritual boundaries of the Hopi way.

121. The Peaks are known to the Hopi as Nuvatukya'ovi – the "Place of Snow on the Peaks." The Peaks are where the Hopi direct their prayers and thoughts, a point in the physical world that defines the Hopi universe and serves as the home of the Kachinas, who bring water, snow and life to the Hopi people.[19]

122. There are more than 40 kivas located throughout the 12 Hopi Villages. The kivas are the focal point of all religious activity in the Hopi Villages and the central place to which the Kachina gather during their annual pilgrimage to and sojourn among the Hopi.

123. The Hopi Tribe's religious practices and their close spiritual tie to the tribe's home and sacred landscape constitute the fabric of the Hopi way, a way of perceiving and responding to the realities of daily life. The individual Hopi's practice of the Hopi way permeates every part and every day of the individual's life from birth to death.

124. To the Hopi, the Peaks are the residence of the Kachina, spiritual deities of the Hopi who travel from the Peaks to the Hopi Reservation to participate in traditional Hopi kiva practices and dances in response to petitions and prayers from the Hopi who are members of each kiva.

125. The Kachinas serve many purposes, among them is to teach lessons to the Hopi and warn them of the consequences of their improper actions.

---

[19] The terms "Kachina" and "Katsina" are synonymous and were used interchangeably during the course of the trial.

126.   Kachina songs teach messages on the principals that a community must live by to stay viable, and for the Hopi, to achieve their destiny.  Hopi children are taught these songs, "[s]o that they can remember the words as they do their work and play in life."

127.   The Hopi calendar connects the months and seasons in the Hopi year, the coming and going of the Kachina from the Peaks, and the ceremonies performed in the kivas on the Hopi Reservation.  Thus for the Hopi, the Kachina define the passing of the months and the continuity of the Hopi culture.

128.   The Hopi Plaintiffs testified that the proposed upgrades to the Snowbowl  have affected and will continue to negatively affect the way they think about the Peaks, the Kachina and themselves when preparing for any religious activity involving the Peaks and the Kachina – from daily morning prayers to the regular calendar of religious dances that occur throughout the year.

129.   The Hopi Plaintiffs also testified that this negative effect on the practitioners' frames of mind due to the continued and increased desecration of the home of the Kachinas will undermine the Hopi faith and the Hopi way.   According to the Hopi, the Snowbowl upgrades will undermine the Hopi faith in daily ceremonies and undermine the Hopi faith in their Kachina ceremonies as well as their faith in the blessings of life that they depend on the Kachina to bring.

130.   Although the Hopi Plaintiffs' testified about the important role that the Kachinas and Kachina songs play in Hopi religion, they presented no evidence that the Snowbowl upgrades would impact any exercise of religion related to the Kachinas or the Kachina songs.   The Kachinas have continued to come to the Hopi villages since the establishment of the Snowbowl ski area in the late 1930s, and since the Forest Service approved the expansion of the Snowbowl in 1979.

131.   Plaintiffs' witness Mr. Kooyahoma stated that despite the Snowbowl upgrades, the Kachinas will continue to come to the Hopi villages.  Mr. Sekaquaptewa agreed that

the Hopi will continue to conduct religious activities on the Peaks, such as the collection of Douglas fir and tobacco.

132. The Hopi Plaintiffs presented evidence that the Snowbowl upgrades are contrary to their beliefs, and that making artificial snow will affect them "emotionally"; however, the Hopi Plaintiffs provided no evidence that the decision would impact any religious ceremony, gathering, pilgrimage, shrine, or any other religious use of the Peaks.  The Hopi Plaintiffs presented no evidence that they use the Snowbowl SUP for any religious purpose.

### viii.  Plaintiff Yavapai-Apache Nation

133. The Yavapai-Apache Nation is a federally recognized Indian tribe consisting of approximately 1,550 enrolled members.  The 636-acre Yavapai-Apache Reservation is located in the Verde Valley in central Yavapai County, Arizona.

134. The Yavapai-Apache Plaintiffs offered the testimony of only one witness: Tribal Council member Vincent E. Randall.

135. The four sacred mountains to the Yavapai-Apache Nation are the Peaks, the Red Mountain just south of Fort McDowell, Pinal Mountain, and the eastern Mount Baldy in New Mexico.

136. The Yavapai-Apache Nation view the Peaks as one living being and believe that the use of reclaimed water for snowmaking may make the mountain impotent.

137. Although the Yavapai Apache members collect medicine at the Peaks, the Yavapai-Apache Plaintiffs presented no evidence that they use the Snowbowl SUP for any religious purpose.

138. Mr. Randall discussed certain Apache beliefs and ceremonies; however, he did not provide evidence that the Snowbowl project would impact any discernable religious exercise.

139. Mr. Randall testified that four or five Yavapai-Apache members collect herbs on the Peaks; however, these holy herbs occur all over the Peaks and not exclusively in the

SUP area.  The Snowbowl decision would not prohibit the collection of these herbs in any way.

### d.    Compelling Governmental Interest

140.    National Forests must be managed for multiple uses.  See National Forest Management Act, 16 U.S.C. §§ 1600 et seq. ("NFMA").  Specifically, Congress has mandated that the Forest Service manage the National Forests for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes."

141.    In addition to NFMA, the Forest Service must consider a variety of other federal laws and executive orders in managing the CNF, including but not limited to NEPA, the NHPA, the ESA, the National Forest Ski Area Permit Act,  the Wilderness Act, 16 U.S.C. §§ 1131, et seq., and the Multiple-Use Sustained Yield Act, 16 U.S.C. §§ 528-531.

142.    National Forest Service Plans provide guidance for the management of the National Forests.  Every National Forest must prepare a Forest Plan in accordance with NFMA.  Forest Plans are subject to the requirements of NEPA.  Therefore, a public review and comment period is provided for every Forest Plan.

143.    After a lengthy public review and comment period, the Coconino Forest Service Plan was approved in 1987.  The Coconino Forest Service Plan provides for integrated multiple-use and sustained yield of goods and services from the forest in a way that maximizes long-term public benefits in an environmentally sound manner.

144.    The CNF's Peaks Ranger District, which is home to the Peaks, has a diversity of vegetation types and geography.  The cultural resources on the Peaks Ranger District are also diverse, ranging from lithic scatters to prehistoric and habitation sites to the "paramount cultural resource" of the Peaks.

145.    The Coconino Forest Service Plan calls for various future uses, including recreational and wilderness uses.   The Forest Plan also specifically adopted several prior

management decisions, including the Environmental Impact Statement for the Arizona Snowbowl and the prior allocation of areas with the CNF as Wilderness.

146. The Coconino Forest Service Plan designates 37 MAs within the CNF. Each MA is subject to specific management guidelines. The MA designations in the Coconino Forest Service Plan accommodate a variety of uses and users, such as cattle and sheep grazing, power lines, gas lines and mining. The Navajo Nation, which grazes cattle on the northern slopes of the Peaks is one such user.

147. Pursuant to the Coconino Forest Plan, the Peaks Ranger District is managed for a variety of uses, including wildlife, timber, livestock grazing, and outdoor recreation. The Forest Service and, more specifically, the Forest Supervisor have a responsibility to all of the users of the CNF.

148. The Forest Coconino designates the Snowbowl SUP area as MA-15 (i.e., Developed Recreation Sites) and therefore, directs that the Snowbowl SUP area be managed as a developed ski area.

149. The SUP for the Arizona Snowbowl reflects the decision of the Forest Service to operate and maintain the ski area for 40 years. The SUP also directs the Forest Service's management of the SUP area.

150. The need to manage National Forests for multiple uses is complicated by the sheer number of sites that are considered to be sacred by tribes.

151. The Southwestern Region of the National Forest regularly consults with about 50 tribes who have traditional use and ancestral ties to National Forests. The Region consults with tribes on 900 to 1,000 projects each year.

152. On National Forest lands within Arizona and New Mexico alone there are at least 40 to 50 mountains that are generally considered sacred by tribes. Pursuant to the agency's multiple-use mandate, these mountains are managed for recreational use, wildlife purposes, forest health purposes, special uses ranging from pipelines to summer homes, and wilderness values.

153.   In the CNF, almost a dozen mountains have been identified by tribes as being sacred. In additions, tribes find other landscapes to be sacred, including canyons and canyon systems, rivers and river drainages, lakes, discrete mesas and buttes and rock formations.  There are additional areas considered to be sacred by tribes such as shrines, gathering areas, pilgrimage routes and prehistoric sites.  Between 40,000 and 50,000 prehistoric sites have been inventoried within the Southwestern Region forest lands.

154.   Including the Snowbowl, the National Forests in the Southwestern Region are home to eleven ski areas, several of which are located on or near areas that are sacred to tribes.

155.   Millions of acres of public land–Forest Service lands and other federal lands–are considered sacred to Plaintiffs.

156.   There are likely thousands of sites and shrines that are sacred to the Hualapai Tribe. The Hualapai Plaintiffs consider the entire Colorado River to be sacred.

157.   Within the Navajo Nation's four cardinal mountains, all of which are located on federal land, there are several thousand sacred sites.  For example, the Navajo Plaintiffs consider the entire Colorado River — from the headwaters to Mexico — and the Little Colorado River to be sacred.

158.   There are thousands of sites considered to be sacred to the Havasupai Plaintiffs.  For example, the Havasupai Plaintiffs consider 277 miles of the Colorado River to be sacred.

159.   There are hundreds of sacred Hopi sites and shrines throughout the American Southwest, with some as far away as Ohio.  There are more than 10,000 archeological sites that have specific Hopi clan traditions tied to them.

160.   Moreover, new sacred areas are continuously being created.

161.   The management decisions of the Plaintiff tribes with respect to their own lands suggest that the Plaintiff tribes face similar complications.

162.   For example, land on the WMA Plaintiff's reservation, which is considered sacred by members of the tribe, is allocated to a variety of uses.  Some portion of the reservation is managed as a "closed area," where developed recreation is not permitted and other portions of the WMA reservation are dedicated to recreational uses.  Recreational activities on the reservation include 7,000 camp sites, hiking trails, fishing, hunting, boating, guided white water rafting tours, rodeos, and skiing.  According to Chairman Massey, recreation can be a positive influence on people's lives, especially tribal youth.

163.   Also, the White Mountains, considered sacred to members of the WMA, are home to the Sunrise ski resort, which is owned and operated by the WMA Tribe.  In fact, the Sunrise ski resort relies upon artificial snowmaking, and the water source for this snowmaking is, in part, reclaimed water.  Many WMA spiritual leaders consider the presence of the Sunrise ski resort on the White Mountains to be a desecration.

164.   Reclaimed water is used by many of the Plaintiff tribes.  The Navajo Nation uses reclaimed water for irrigation, for dust control at construction sites, and for soil compacting on dirt roads.

165.   The White Mountain Apache Tribe used reclaimed water as part of the Canyon Day Irrigation Project, and currently uses reclaimed water in its stock pond at the Hon-Dah casino.  The Yavapai-Apache Nation has used reclaimed water to irrigate the grounds around Cliff Castle Casino in Camp Verde, Arizona.  The Havasupai Plaintiffs have used reclaimed water from a lagoon system, which does not provide any chemical or ultraviolet treatment, to irrigate alfalfa sprout crops in Supai Village.

166.   Also, mining is conducted on Black Mesa although the Navajo Nation and the Hopi Tribe  consider it to be sacred.  The Hopi Tribe transferred Hopi water rights in order to provide water for a coal slurry pipeline at Black Mesa.

167.   Wastes from medical clinics on the reservation are disposed in lagoons or on the ground at the Navajo reservation, which is considered sacred.

### i. Safety

168. The Snowbowl upgrades have a number of features that would address the CNF's safety concerns.

169. Upgrades were needed because the existing terrain is insufficient for current use levels, which leads to overcrowding and safety issues on peak-attendance days, especially given the area's high utilization rates.

170. When snow levels permit operation, the Snowbowl significantly exceeds the ski area's comfortable carrying capacity of 2,825 guests. Over the past 10 seasons, average peak day attendance has been approximately 3,434 guests.

171. The Snowbowl upgrades will address safety issues associated with overcrowding on the ski slopes by providing more skiable acreage, providing more novice and intermediate ski terrain, and enabling the owners of the Snowbowl ski area to make improvements to narrow trails with congestion problems.

172. Adding additional ski terrain will permit skiers to spread out across the slope and reduce some of the safety concerns related to overcrowding.

173. The Forest Service identified a need to respond to unregulated snowplay activities on the National Forest System lands on and around the Snowbowl. The Forest Service explained that people seeking to sled, slide, and saucer have historically done so on unmanaged areas of the CNF along Snowbowl Road and along Highway 180. These activities have lead "to injuries, traffic management issues, garbage, and sanitation problems."

174. The snowplay area included in the Snowbowl Upgrade Project responds to these safety concerns.

175. Snowbowl Road was designed with pullouts in order to facilitate tribal members' access to forest areas used for cultural purposes.

## ii.  Compliance with the Establishment Clause

176.   The CNF requires the ongoing management of 1.8 million acres for a variety of users and uses.

177.   Conflicts associated with allocation of forest resources between the various uses and users is inevitable.

178.   Nevertheless, the Forest Service has sought to accommodate the religious activities of the Plaintiff tribes.  In fact, the Forest Service has sometimes even facilitated the religious practices of the Plaintiff tribes.

179.   The Forest Service participated in efforts to cease mining activities at the White Vulcan Mine, a pumice mine that operated on the Peaks for about a half-century.

180.   The Forest Service successfully sought to designate 19,000 acres surrounding the SUP area as the Kachina Peaks Wilderness, thus protecting the area from future development.  Tribal members use the Kachina Peaks wilderness to conduct religious ceremonies and practices.  The Hopi Plaintiffs agreed that the Kachina Peaks Wilderness is a benefit to Hopi culture.

181.   The Forest Service is also currently in the process of nominating the Peaks to the National Register of Historic Properties as Traditional Cultural Property.

182.   Members of the general public must pay to remove forest products, such as plants, from the Peaks.  Tribal members can remove those same forest products for religious purposes for free.

183.   When the Forest is closed due to fire risk, the CNF ensures tribal access for ceremonial and other religious purposes.

184.   The east side of the Peaks has the highest archeological site density because it has more favorable farming conditions.  The Snowbowl SUP is located on the west side.

185.   The Forest Service accommodated Hopi concerns by requiring the owners of the Snowbowl ski area to limit public access to the top of the Peaks.

186.   The Forest Service would be hard pressed to satisfy the religious beliefs of all Plaintiffs.

187.   For example, the Navajo Plaintiffs' official position is that the Snowbowl should be shut down completely.   The Navajo Plaintiffs would oppose snowmaking at the Snowbowl even if the snow was made from fresh water.  In fact, the Navajo Nation opposes any upgrades at the Snowbowl, even those designed to improve safety.

188.   Plaintiff Preston expressed his belief that there should be no development whatsoever on the Peaks and would, therefore, oppose snowmaking at the Snowbowl even if fresh water was used.

189.   According to Plaintiff Tilousi, any actions that disturb life, "whether plant life, wildlife, the earth, the air, [or] the waters" would be objectionable.  However, there is less concern when an area has already been disturbed.

190.   In conclusion, the Snowbowl upgrades satisfy the government's interest in managing the CNF for multiple uses, in ensuring the safety of visitors to the Snowbowl ski area, and in complying with the Establishment Clause.

### e.   Least Restrictive Means

191.   The Forest Service also sought to identify tribal concerns with the proposed Snowbowl upgrades in order to seek ways to mitigate, minimize, or avoid potential impacts.

192.   After over a dozen cultural resources surveys and decades of consultation with tribes regarding the cultural and religious significance of the Peaks, tribal members have not identified any specific plants, springs, natural resources, shrines or locations for ceremonies in the SUP area that will be impacted–much less substantially burdened–by the Snowbowl improvements.

193.   The Forest Service removed night lighting from the project, in response to opposition from the Navajo, Hopi, and Yavapai-Apache Plaintiffs.

194.   The Forest Service contacted thirteen tribes, the Medicineman's Association, and several Navajo Nation chapter houses regarding the development of a Memorandum of Agreement ("MOA").

195.   In the process of developing the MOA, the Forest Service sought the input of the thirteen tribes, the Medicineman's Association and the chapter houses to determine whether the potential and perceived tribal impacts could be mitigated, minimized or avoided.

196.   Snowmaking would provide for a consistent operating season and enable the Forest Service to continue the operation of the ski area as a Developed Recreation Area in accordance with the Coconino Forest Service Plan.  Moreover, snowmaking at ski areas is not uncommon.

197.   Four tribes signed the MOA, including the Hualapai Plaintiffs and the Yavapai-Apache Plaintiffs.  While signing the MOA does not necessarily indicate that the Hualapai Plaintiffs and the Yavapai-Apache Plaintiffs approved the Forest Service's decision, it does indicate the Forest Service's efforts to deal with adverse effects.

198.   The agency guaranteed, in the MOA, that access to the Peaks, including the SUP, for cultural and religious uses would be protected.  Pursuant to the terms of the MOA, the Forest Service also committed to work to ensure that tribal ceremonial activities conducted on the Peaks continue uninterrupted.

199.   Also, under the MOA, the Forest Service agreed to work with the tribes to provide periodic inspections by tribal representatives to examine the condition of existing shrines and other existing traditional cultural places on the Peaks.

200.   The Forest Service will continue to guarantee traditional cultural practitioners access within and outside the SUP area for traditional cultural uses, such as collection of medicinal, ceremonial, and food plants.

201.   Should any plants of traditional importance be subsequently identified within the project area, the Forest Service will encourage and protect the natural regeneration of those plants when developing site-specific plans.

202.   The Forest Service also agreed to continue working with tribal liaisons and traditional cultural practitioners to ensure that current ceremonial activities conducted on the Peaks continue uninterrupted.  The MOA provides that when the final reclaimed water pipeline is field staked, the Forest Service will contact the tribes and offer to walk that area to ensure no special places are impacted.

203.   The Forest Service also committed in the MOA to sharing with the tribes any authorized monitoring reports regarding water quality and the effects of additional moisture on plants, animals, and the terrain.

204.   The MOA guaranteed that, to the extent practicable, the final locations of new ski runs will take advantage of previously-disturbed areas, such as where trees were already dead.

205.   About 900 gallons per minute are needed to make a sufficient amount of snow for the Snowbowl upgrades.

206.   Although the use of fresh water for snowmaking would not alleviate the tribes' religious concerns, several alternative water sources were considered.  However, after logistics, economics, water availability, alternate distribution systems, etc., were studied, the use of potable water sources rather than reclaimed water was determined to be imprudent.

207.   J.R. Murray, manager of the Arizona Snowbowl ski area sought advice from several local experts regarding possible sources of water for snowmaking and the availability and sustainability of such sources.

208.   It would not be feasible to haul potable water up to the Snowbowl for snowmaking because it would not be possible to transport the necessary quantity of water up to the Snowbowl SUP area.

209.   The City of Flagstaff was unwilling to provide potable water for snowmaking at the Snowbowl ski area due to their long-term concerns with water availability.

210.   It would not be feasible to harvest water, i.e., to collect surface water off of an impermeable surface in order to make snow at the Snowbowl ski area because the volcanic rock on the Peaks has a high infiltration capacity.

211.   Perched water-bearing zones are thin, discontinuous water systems that rely on seasonal recharge to be replenished.  For example, the perched water-bearing zone in the Inner Basin is typically only a seasonal supply of water.

212.   The perched water-bearing zone in the Inner Basin is a not a reliable source of water due to the nature of perched water-bearing zones, the City of Flagstaff's use of water from this area, and the fact that the availability of water in this area is entirely dependent upon snowmelt for recharge.

213.   The perched water-bearing zones in the Hart Prairie area are typically even smaller than the perched water-bearing zones in the Inner Basin.[20]  The capacity of the perched water-bearing zones in the Hart Prairie area are relatively small.  Although it is not uncommon to drill a well into the perched water-bearing zone in the Hart Prairie area and not hit water, successful wells in the perched water-bearing zones in the Hart Prairie area yield just a few gallons to a few tens of gallons per minute of water.  Therefore, it would be necessary to drill at least 100 wells into the perched water-bearing zone in the Hart Prairie area to obtain about 1000 gallons of water per minute.

214.   The perched water-bearing zones in the Fort Valley area are small and discontinuous.  It is common to drill a well into the perched water-bearing zone in the Fort Valley area and not hit water.  The capacity of wells drilled into perched water-bearing zones in the Fort Valley area are typically a few gallons to no more than 10 or 20 gallons of water per minute.

---

[20]   The ski area's original base was established in Hart Prairie in 1938.

215. Based upon current information, the C-Aquifer underlying the Peaks is only partly saturated, and the depth to water below land surface under the Peaks would be in the order of more than 3000 feet.

216. The cost of drilling a hole and placing casing in the hole for a well to the C-Aquifer would cost around $500,000 to $1 million. This amount does not include the cost of conducting hydrologic or geologic studies in advance of drilling the well, which would increase the likelihood of developing a successful well. It is possible to encounter difficulties in drilling to the C-Aquifer that could effectively cause the drilling program to fail. Although it is known that there is water in the R-Aquifer underlying the Peaks, at this time, it is not possible to estimate the capacity of the R-Aquifer in and around the Peaks.

217. Typically, the parts of the C-Aquifer that are unsaturated are substantially deeper.

218. The R-Aquifer is located as much as 1000 feet below the bottom of the C-Aquifer.

219. The cost of drilling a hole and placing casing in the hole for a well to the R-Aquifer around the Peaks would cost at least $3 million. This amount does not include the cost of other actions that it would be prudent to undertake prior to drilling such a well.

220. It is possible to encounter difficulties in drilling to the R-Aquifer that could effectively cause the drilling program to fail.

221. There is a risk that a well drilled to the R-Aquifer would not have sufficient yield, and the well would fail or collapse.

222. While the Court has enumerated findings of fact herein, these findings are not intended to be all inclusive or narrowly limiting. A great number of additional findings could be made in support of the Court's conclusions of law.

**B.    Conclusions of Law**

1. Under RFRA, a law of general applicability that provides conduct that substantially burdens a person's exercise of religion is invalid unless the law is the least restrictive means of serving a compelling government interest. 42 U.S.C. § 2000bb-1(b). The

statutorily imposed test must be interpreted with regard to the relevant circumstances in each case.  See Hamilton v. Schriro, 74 F.3d 1545, 1553 (8th Cir. 1996).

2.   To establish a prima facie case under RFRA, a plaintiff must show that the law substantially burdens his ability to freely exercise his religion.  Guam, 290 F. 3d at 1222.  Once a plaintiff has established a prima facie case, the burden shifts to the defendant to demonstrate that the law furthers a "compelling interest" using the least restrictive means.  Id.

3.   The compelling interest test, which had been the standard for analyzing First Amendment free exercise claims, was rejected in Employment Division v. Smith, 494 U.S. 872 (1990).  Congress enacted RFRA to restore pre-Smith law and the compelling interest test.  42 U.S.C. § 2000bb(b)(1).

4.   RFRA provides no definition of "substantial burden." Rather, in enacting RFRA, Congress expected "that the courts will look to free exercise cases decided prior to Smith for guidance in determining whether the exercise of religion has been substantially burdened." S. Rep. No. 103-111 at 8-9 (1993).  Therefore, free exercise cases decided prior to Smith involving land management decisions – such as Lyng v. Northwest Cemetery Protective Ass'n, 485 U.S. 439 (1988) and Wilson, 708 F.2d at 735, cert. denied, sub nom. Navajo Medicinemen's Ass'n v. Block, 464 U.S. 1056 (1984) – are instructive here.

5.   The Ninth Circuit has clearly articulated the proper legal standard to be applied in this case: an action "burdens the free exercise of religion if it puts substantial pressure on an adherent to modify his behavior and violate his beliefs, including when . . . it results in the choice of an individual of either abandoning his religious principle or facing criminal prosecution." Guam, 290 F.3d at 1222.

## 1.    Substantial Burden

6.   A RFRA plaintiff has the burden of showing that the government's action "burdens the adherent's practice of his or her religion by pressuring him or her to commit an act

forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which the faith mandates." <u>Worldwide Church of God v. Philadelphia Church of God, Inc.</u>, 227 F.3d 1110, 1121 (9th Cir. 2000); <u>see</u> <u>Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter</u>, 326 F. Supp. 2d 1140, 1152 (E.D. Cal. 2003) ("To meet the 'substantial burden' standard, the governmental conduct being challenged must <u>actually</u> <u>inhibit</u> religious activity in a concrete way, and cause more than a mere inconvenience.") (emphasis in original).

7.   The government's land management decision will not be a "substantial burden" absent a showing that it coerces someone into violating his or her religious beliefs or penalizes his or her religious activity. <u>Lyng</u>, 485 U.S. at 449-53 (the case law "does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions, but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions"); <u>see</u> <u>Wilson</u>, 708 F.2d at 741 ("Many government actions may offend religious believers, and may cast doubt upon the veracity of religious beliefs, but unless such actions penalize faith, they do not burden religion."); <u>see</u> <u>also</u> <u>Havasupai Tribe</u>, 752 F. Supp. at 1484-1486 (finding Forest Service approval of plan for operations of uranium mine does not substantially burden exercise of religion because, although Havasupai Tribe's religious and cultural belief systems are "intimately bound up" in the site, "Plaintiffs are not penalized for their beliefs, nor are they prevented from practicing their religion."); <u>Means</u>, 858 F.2d at 406-07 (finding no substantial burden where "[t]he Forest Service has performed no act of compulsion to interfere with appellees' ceremonies or practices nor has it denied them access to [the Forest lands] for religious purposes").

8.   Indeed, "Courts consistently have refused to disturb governmental land management decisions that have been challenged by Native Americans on free exercise grounds." <u>Means</u>, 858 F.2d at 407 (providing citations to numerous cases).

9.   The statutory duty imposed by RFRA is only fairly viewed in the context of other Congressional mandates, such as the National Forest Management Act's multiple-use mandate.  See 16 U.S.C. § 1604(e).

10.   The evaluation of when the government's land management decisions cross the line from legitimate conduct to unconstitutional prohibitions on the free exercise of religion "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." Lyng, 485 U.S. at 451.

11.   Allowing such a subjective definition of substantial burden would open the door to the imposition of "religious servitudes" over large portions of federal land.  Id. at 452-53 (noting that while Plaintiffs "stress the limits of the religious servitude that they are now seeking" . . . "[n]othing in the principle for which they contend . . . would distinguish this case from another lawsuit in which they . . . might seek to exclude all human activity but their own from sacred areas of the public lands.").

12.   "RFRA on its own does not provide a freestanding right to free exercise of religion on another's property." Benally v. Kaye, Order, Civil No. 3:03-CV-01330-PCT-NVW (D. Ariz. Sept. 7, 2005) (dismissing claim that Hopi Tribe law enforcement substantially burdened Navajos' exercise of religion by taking various actions to interfere with their Sundance ceremony).

13.   Here, Plaintiffs have failed to demonstrate that the Snowbowl decision coerces them into violating their religious beliefs or penalizes their religious activity. Cf. Lyng, 485 U.S. at 449 182.  In fact, the Forest Service has guaranteed that religious practitioners would still have access to the Snowbowl and the approximately 74,000 acres of the CNF that comprise the Peaks for religious purposes.

14.   Plaintiffs have failed to present any objective evidence that their exercise of religion will be impacted by the Snowbowl upgrades.  Plaintiffs have not identified any plants, springs or natural resources within the SUP area that would be affected by the

Snowbowl upgrades. They have identified no shrines or religious ceremonies that would be impacted by the Snowbowl decision.

15. Plaintiffs' assertions of perceived religious impact are near identical to those voiced by the Hopi Tribe and the Navajo Nation in <u>Wilson v. Block</u>. In that case, the plaintiffs similarly asserted that "development of the Peaks would be a profane act, and an affront to the deities, and that, in consequence, the Peaks would lose their healing power and otherwise cease to benefit the tribes." 708 F.2d at 740. They contended "that development would seriously impair their ability to pray and conduct ceremonies upon the Peaks." <u>Id.</u> Considering this information, the D.C. Circuit found the agency's decision did not substantially burden the tribes' exercise of religion. <u>Id.</u> at 745. The same decision is warranted here. The subjective views and beliefs presented at trial, although sincerely held, are not sufficient for the proposed project to constitute a substantial burden under RFRA on the practice of religion by any Plaintiff or any members of any Plaintiff tribe or nation.

16. If the facts alleged by Plaintiffs were enough to establish a substantial burden, the Forest Service would be left in a precarious situation as it attempted to manage the millions of acres of public lands in Arizona, and elsewhere, that are considered sacred to Native American tribes.

17. As the D.C. Circuit found in <u>Wilson</u>:

> The Secretary of Agriculture has a statutory duty . . . to manage the National Forests in the public interest, and he has determined that the public interest would best be served by expansion of the Snow Bowl ski area. In making that determination, the Secretary has not directly or indirectly penalized the plaintiffs for their beliefs. The construction approved by the Secretary is, indeed, inconsistent with the plaintiffs' beliefs, and will cause the plaintiffs spiritual disquiet, but such consequences do not state a free exercise claim under <u>Sherbert</u>, <u>Thomas</u>, or any other authority.

<u>Id.</u> at 741-42.

18. The Snowbowl decision does not bar Plaintiffs' access, use, or ritual practice on any part of the Peaks. The decision does not coerce individuals into acting contrary to their religious beliefs nor does it penalize anyone for practicing his or her religion.

19. Indeed, Defendants have committed, in the MOA, to ensuring that religious practitioners will have access to the 777-acre SUP area and the approximately 74,000 remaining acres of the Peaks for religious purposes.

20. Because Plaintiffs have not demonstrated a substantial burden to any exercise of religion, Plaintiffs have failed to establish a prima facie RFRA case.

### 2. Compelling Governmental Interest

21. When applying the compelling government interest standard, "[c]ontext matters." Cutter v. Wilkinson, 125 S.Ct. 2113, 2123 (2005), citing Grutter v. Bollinger, 539 U.S. 306, 327 (2003) (alterations in original). Thus, "accommodation must be measured so that it does not override other significant interests." Id.

22. The government has a compelling interest in selecting the alternative that best achieves its multiple-use mandate under the National Forest Management Act. The Forest Service here has a compelling interest in managing the public land for recreational uses such as skiing.

23. Congress has directed the Forest Service to manage the National Forests for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 1604(e). Providing the public opportunities for outdoor recreation on the public lands is thus integral to the Forest Service's mission in managing the National Forests.

24. Congress established a permitting system in order to facilitate the operation of ski areas and facilities on National Forest land. 16 U.S.C. § 497b; 36 C.F.R. § 251.53(n). Accordingly, many National Forests, including the CNF, have established designated recreation sites for skiing. The operation of the ski areas, through the special-use permit system, allows the Forest Service to provide the type of "outdoor recreation" mandated by NFMA.

25.   The CNF Forest Service Plan, which underwent its own public review process, directs the Forest Service to manage the Snowbowl as a developed ski area.

26.   The protection of public safety is also a compelling governmental interest.   Cf. Wisconsin v. Yoder, 406 U.S. 205, 230 (1972); Sherbert v. Verner, 374 U.S. 398, 403 (1963).   Here, the Forest Service has a compelling interest in authorizing upgrades at Snowbowl to ensure that users of the National Forest ski area have a safe experience.

27.   The Forest Service's compliance with the Establishment Clause is an additional compelling government interest. See Seidman v. Paradise Valley Unified Sch. District No. 69, 327 F. Supp. 2d 1098, 1112 (D. Ariz. 2004) ("compliance with Establishment Clause is a state interest sufficiently compelling to justify content based-restrictions on speech") (citing Capitol Square Review & Advisory Bd v. Pinette, 515 U.S. 753, 761-62 (1995)); see also Widmar v. Vincent, 454 U.S. 263, 271 (1981) (government's interest in complying with its constitutional obligations is compelling).

28.   While Plaintiffs may find it offensive that lands that have cultural and religious significance to them also host recreational activities, this cannot justify a "religious servitude" over large   amounts of public land.   "The Supreme Court has held repeatedly that the First Amendment may not be asserted to deprive the public of its normal use of an area." Inupiat Comty. of Arctic Slope v. United States, 548 F. Supp. 182, 189 (D. Alaska 1982) (finding government's interest in pursuing mineral development on public lands outweighed alleged interference with religious beliefs); Lyng, 485 U.S. at 453 ("Whatever rights the Indians may have to the use of the area . . ., those rights do not divest the Government of its right to use what is, after all, its land."); see also Means, 858 F.2d at 408 n.7.

### 3.   Least Restrictive Means

29.   The Ninth Circuit has held that the government meets its burden of showing the least restrictive means if "it demonstrates that it actually considered and rejected the efficacy of less restrictive means before adopting the challenged practice." Warsoldier

v. Woodford, 418 F.3d 989, 999 (9th Cir. 2005); see also U.S. v. Antoine, 318 F.3d 919, 923-24 (9th Cir. 2003), cert. denied, 540 U.S. 1221 (2004); U.S. v. Hugs, 109 F.3d 1375, 1378-79 (9th Cir. 1997) (government permit scheme was the least restrictive means because it still permitted access to eagles and eagle parts for religious purposes, albeit not in as convenient a manner as the Indian defendants would have liked).

30.   The Forest Service chose the least restrictive means for achieving its land management decision.

31.   The Forest Service has determined that the Snowbowl facilities' improvements, including snowmaking, will enable the ski area to provide a safe, reliable and consistent operating season.  Furthermore, the evidence adduced at trial demonstrates that snowmaking is needed to maintain the viability of the Snowbowl as a public recreational resource.

32.   In carrying out its obligations under NEPA and NHPA, the Forest Service reached a decision that enables the purposes of the Snowbowl improvements to be carried out in a manner that is designed to minimize adverse impacts, including impacts to the tribes' culture and religion.

33.   The Forest Service considered the use of fresh water, including ground water, and determined that it was not readily available.  Likewise, the Forest Service considered reduced snowmaking (and therefore a lesser amount of reclaimed water used on the mountain), but determined that this was impracticable and would not address tribal concerns.

34.   The Forest Service also considered an alternative that would not permit any snowmaking (Alternative 3) on the Peaks, and a No-Action Alternative, but determined that adopting such an approach would likely lead to the loss of the Snowbowl facility

35.    Plaintiffs cannot "demonstrate what, if any, less restrictive means remain unexplored." Hamilton, 74 F.3d at 1555.   The government is not required to "refute every conceivable option" to prove that its action is narrowly tailored.  Id.

36.    A reviewing court should not second-guess the reasonable determination of the responsible government official by means of a de novo assessment of whether there is some other, less intrusive means of achieving the government's objective.  Ward v. Rock Against Racism, 491 U.S. 781, 797 (1989) ("The Court of Appeals erred in sifting through all the available or imagined alternative means of regulating sound volume in order to determine whether the city's solution was 'the least intrusive means' of achieving the desired end.") and id. at 800.  Accord, Clark v. Cmty For Creative Non-Violence, 468 U.S. 288, 299 (1984); Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914, 917 (2d Cir. 1990).

37.    The Court finds as a matter of fact and concludes as a matter of law that the Forest Service's decision to authorize upgrades to an existing ski area on the CNF is not a violation of RFRA.

**III.   Conclusion**

The Forest Service properly observed all of the procedural requirements during the various stages of approving the Snowbowl project, including preparation of an extensive EIS. The Court's role is to review compliance with these procedures, not to review the substance of the agency's decision.  Therefore, Defendants' and Defendant-Intervenor's motions for summary judgment are granted, and Plaintiffs' motions for summary judgment are denied. As such,

IT IS ORDERED that the Defendants' Motion for Summary Judgment (Doc. 71) is GRANTED in part and DENIED in part.  The motion is denied with respect to the Plaintiffs' RFRA claims only, and is granted with respect to all other counts.

IT IS FURTHER ORDERED that Arizona Snowbowl Resort's Motion for Summary Judgment (Doc. 68 ) is GRANTED in part and DENIED in part.  The motion is denied with respect to the Plaintiffs' RFRA claims only, and is granted as to all other counts.

IT IS FURTHER ORDERED that the Navajo Plaintiffs' Motion for Summary Judgment (Doc. 73) is DENIED.

IT IS FURTHER ORDERED that the Hopi Plaintiffs' Motion for Summary Judgment (Doc. 65) is DENIED.

IT IS FURTHER ORDERED that the Hualapai Plaintiffs' Motion for Summary Judgment (Doc. 67) is DENIED.

IT IS FURTHER ORDERED that the Havasupai Plaintiffs' Motion for Summary Judgment (Doc. 70) is DENIED.

IT IS FURTHER ORDERED that the Plaintiffs' claims under RFRA are DISMISSED.

IT IS FURTHER ORDERED that the Navajo Plaintiffs' Motion to Amend/ Correct Amended Complaint (Doc. 75) is DENIED.

IT IS FURTHER ORDERED that the Defendants' Motion for Leave to File Proposed Findings of Fact and Conclusions of Law Beyond Deadline (Doc. 259) is GRANTED.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment in favor of the Defendants and Defendant-Intervenor and against Plaintiffs on all counts.

DATED this 11th day of January, 2006.

Paul G. Rosenblatt
United States District Judge